**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**JOE'S STONE CRAB, INC., Defendant.**

**No. 93–1082–CIV.**

United States District Court, S.D. Florida.

Aug. 12, 1998.

---

Gedety Serralta, Rachel Shonfield, Michael Farrell, Miami District Office, EEOC, Miami, FL, for Plaintiff.

Robert D. Soloff, Julie Waas, R. David Rosen, Fort Lauderdale, FL, for Defendant.

## MEMORANDUM OPINION ON MONETARY DAMAGES & INJUNCTIVE RELIEF

HURLEY, District Judge.

At the conclusion of the liability phase of this case, the court found Joe's Stone Crab, Inc. (Joe's or "the restaurant") guilty of sex discrimination. *See EEOC v. Joe's Stone Crab, Inc.*, 969 F.Supp. 727 (S.D.Fla.1997). This finding was based on an examination of Joe's employment practices which showed that management delegated total hiring authority to subordinates who, without the benefit of policies [1] or guidelines, used subjective criteria to select only males for food server positions. One high-ranking subordinate conceded that "[i]t was always tradition from the time I arrived there that it was a male server type of job. And until just recently when we became aware that we had to do other things, ... originally it was traditionally a male place." L.Tr. 1484–85.[2] With one notable exception, Joe's entire seventy-member serving staff was male. Despite what should have been apparent, management never voiced a concern nor questioned the hiring staff's decisions. Indeed, the general manager admitted that it never struck him as odd that female food servers were not being hired. L.Tr. 1467. In this environment, management's silence conveyed approbation. As previously found by the court, "what prevailed at Joe's, albeit not mandated by written policy or verbal direction, was the ethos that female food servers were not to be hired." *Joe's Stone Crab, Inc.*, 969 F.Supp. at 732. And, in fact, they were not. Prior to the EEOC's intervention, female applicants for food server positions at Joe's had no reasonable likelihood of being hired.

During the subsequent trial on damages, Joe's called Gerri Isaacson as a witness in an effort to demonstrate that female applicants are no longer subject to sex discrimination. Ms. Isaacson applied for a food server's position in 1994 but was not selected. Undaunted, she diligently prepared to reapply in 1997. She purchased a commercial serving tray, loaded it with household china and carried it about her apartment, developing the skill to pass Joe's mandatory tray test. Concerned that her past employment might not reflect her ability to meet Joe's stringent standards, she gathered letters of recommendation from satisfied customers to attach to her resume, which she presented to Joe's hiring panel. She arrived early at the '97 roll call [3] and was among the first interviewed. Her efforts paid off. She was invited to "trail" (Joe's term for on-site observation) and ultimately was selected for a coveted food server's position at Joe's, one of Miami Beach's premier restaurants.

Gerri Isaacson's experience epitomizes the goal of this litigation: to ensure that all women who apply to work at Joe's will be evaluated on merit, free from sex discrimination. This is more than an aspiration; it is the law of the land: sex discrimination is illegal. In a community where tourism is a major component of the economy and where food serving positions can be highly remunerative, all individuals must be free to compete on the basis of merit. The Old World notion that it is "classier" to have only male food servers is, at best, a quaint anachronism; it is not a defense to the charge of sex discrimination.

Throughout this litigation, Joe's has sought to portray itself as the hapless victim of a powerful government agency gone awry. Yet it is indisputable that it was not until 1991, *after* the EEOC announced its investigation, that Joe's began to hire female food servers in significant numbers. Until then, virtually every member of the seventy-plus serving staff was male. From 1986 until 1990, in the period just *before* the EEOC announced its investigation, the restaurant filled 108 successive vacancies with male ap-

---

1. Joe's chief executive testified "it is not a policy at Joe's to have policy." L.Tr. 2762.

2. "L.Tr." refers to the transcript of the fifteen-day bench trial on liability which was conducted in two parts, Aug. 20—29, 1996, and Nov. 19—Dec. 17, 1996. "D.Tr." refers to the transcript of the ten-day bench trial on damages which was conducted on April 15—28, 1998.

3. Each year, on the second Tuesday in October, Joe's conducts a 'roll call' to recruit new servers and fill other positions. The process begins around 10:00 a.m. with introductory remarks and continues throughout the day as applicants are interviewed by a three-person panel.

plicants. Joe's suggestion that women did not want these jobs but were content to work as kitchen helpers, laundry workers, take-out salespeople, and cashiers is not credible. In 1991, when news of the EEOC's investigation appeared in the local media, women applied in unprecedented numbers. Moreover, interest has continued to grow. At the 1997 roll call, which was advertised in the local press,[4] 35 of 125 applicants, or 28%, were female. Clearly, a new order has begun to take hold at Joe's, albeit under the watchful eye of a court-appointed monitor. The progress that has been achieved is commendable, but it cannot expunge the past. Overwhelming evidence proves that Joe's engaged in blatant, prolonged sex discrimination. Consequently, it is only right—indeed justice demands—that Joe's be held accountable for its past illegal activity.

Based on the testimony and evidence presented at the trial on damages, the court makes the following:

### FINDINGS OF FACT

1. Joe's newly-hired food servers start on the luncheon shift which has a lesser earning potential than the dinner shift. As they gain experience, servers are assigned to one or more dinner shifts per week. After the first year, most servers move to full-time dinner shift assignments. Consequently, there are three discernible earning periods for Joe's food servers: (1) the first three months of employment (Oct. 15th to Dec. 31st); (2) the first full calendar year of employment (Jan. 1st—Dec. 31st); and (3) succeeding calendar years.

2. Credible expert testimony established that food servers hired at the October '89 roll call earned $2,998 during the first three months of employment. Servers hired at the October '90 roll call earned $3,934 during the same three-month period. And servers hired at the October '91 roll call earned $2,820 during the same initial period. Servers hired at the '89 roll call, earned $12,516 in 1990; $15,392 in 1991; and $19,436 in 1992. Servers hired at the '90 roll call, earned $13,613 in 1991; and $19,436 in 1992. Servers hired at the '91 roll call earned $17,190 in 1992. Thereafter, servers in each of these three groups earned: $21,534 in 1993; $20,219 in 1994; $21,728 in 1995; $26,006 in 1996; and $26,221 in 1997.[5] *See* Pl.'s Ex. 32(b); Def.'s Ex. 35.

3. Servers do not receive benefits during the first three months of employment at Joe's. Thereafter, the restaurant provides health insurance, life insurance, and profit sharing. The health insurance benefit is valued as follows: 1990: $1,321; 1991: $1,321; 1992: $1,261; 1993: $1,261; 1994: $860; 1995: $944; 1996: $944; 1997: $944. *See* Pl.'s Ex. 15. Plaintiff's and defendant's experts agreed that the profit sharing benefit equaled 2.5% of an employee's annual salary. D.Tr. 534 and 1666. The cost of life insurance was insignificant and, therefore, has not been included by the court. Thus, a server hired at the October '89 roll call received fringe benefits with the following total values: 1989: $0; 1990: $1,634; 1991: $1,706;

4. By court order, advertisements were placed in the Miami Herald, the Sun–Sentinel and the New Times prior to the October 1997 roll call. They read: "Rest. Staff, JOE'S STONE CRAB, Dining Rm Employees, Roll Call Tuesday, October 7 @ 10:00 am, EOE & Drug Free Workplace, EXP'D WOMEN & MEN FOR CAREER SERVER POSITIONS, Wear suitable work shoes. Exc. benefits. If interested call: 305–604–9883, 227 Biscayne St., Miami Bch." *See* Def.'s Ex. 28.

5. A comparison of the evidence submitted by Joe's during the liability trial with the evidence it produced in the damages trial raises profoundly troubling questions. For example, during the 1996 liability trial when it was to Joe's advantage to show that its servers earned high salaries and, therefore, should be included in a more restrictive census category which would have made it more difficult for the EEOC to lay a statistical foundation to establish sex discrimination, Joe's claimed that 90% of the serving staff earned $2,000 per month in the second year of employment. L.Tr. 2253–54. During the subsequent damages trial, however, when Joe's was attempting to minimize potential damages awards, the restaurant produced statistical evidence showing that its servers actually earned $12,516 in 1990, $15,392 in 1991, $19,436 in 1992, $21,534 in 1993, $20,219 in 1994, $21,728 in 1995, $26,006 in 1996, and $26,221 in 1997. Again in the liability trial when it was beneficial to the restaurant to minimize the number of annual openings on its wait staff, Joe's emphasized its low employee turnover. L.Tr. 2476. But in the damages phase, with an eye toward limiting the size of potential back pay awards, Joe's produced statistical data showing that the average tenure for its food servers is three years. *See* Def.'s Ex. 35, tbl. A–2.

and 1992: $1,747. A server hired at the October '90 roll call received fringe benefits with the following total values: 1990: $0; 1991: $1,661; and 1992: $1,747. A server hired at the October '91 roll call received fringe benefits with the following total values: 1991: $0; and 1992: $1,691. Servers hired in '89, '90 and '91 received fringe benefits with the following total values: 1993: $1,799; 1994: $1,365; 1995: $1,487; 1996: $1,594; and 1997: $1,600.

4. Until 1996, Joe's opened each year for a seven-month season, October 15th to May 15th. L.Tr. 1652. In 1996 and 1997, the restaurant closed for approximately six weeks during September and the first part of October. L.Tr. 1653.

### Catherine Stratford

5. Catherine Stratford moved to Florida in 1990, intending to apply for a food server's position at Joe's at the October 1990 roll call. She was deterred from applying, however, when she learned from at least two sources that it would be useless to attend the roll call because Joe's did not hire female food servers. L.Tr. 324–27. Based on Ms. Stratford's testimony regarding her qualifications as a food server [6] and upon the testimony offered by Joe's regarding the criteria used in hiring food servers,[7] the court finds that Ms. Stratford was fully qualified in 1990 to work as a food server at Joe's. If Ms. Stratford had applied and been hired in October of 1990, she would have continued to work at Joe's through 1995.[8]

6. In 1991, Ms. Stratford heard that Joe's was being investigated by the labor board for engaging in sex discrimination. Therefore, she attended the October 1991 roll call and was interviewed for a food server's position. Ms. Stratford was fully qualified in 1991 to work as a food server at Joe's,[9] however she was not selected because Joe's hiring personnel engaged in sex discrimination.

7. Ms. Stratford actually earned these amounts: 1990 (Nov. 1st—Dec. 31st): $3,600; 1991: $20,550; 1992: $18,500; 1993 (Jan. 1st—Aug. 31st): $12,000; 1993 (Sept. 1st—Dec. 31st): $0; 1994: $0; 1995: $0.

6. *See generally* L.Tr. 303–24, 327–34, 344–59, 364–70. Specific examples of Ms. Stratford's relevant experience include: training at the Culinary Institute of America in table service, wine service, and the basics of "the whole food industry," L.Tr. 303–04; approximately 20 years of wait staff experience at the time of application at Joe's, L.Tr. 307; "upscale" and "single service" wait staff experience, L.Tr. 309–10; and experience carrying trays as heavy as fifty pounds, L.Tr. 320.

7. *See generally* L.Tr. 1968–84, 1995–2045 (testimony of Anthony Arneson). Witnesses testifying on behalf of Joe's explained that although Joe's did not have specific written or verbal hiring guidelines, *see, e.g.,* L.Tr. 2009–10, applicants were considered from perspectives including appearance, articulation, attitude and experience. L.Tr. 1969, 1999. Ability to handle heavy food trays was considered a strict requirement. *See* L.Tr. 2042.

8. To calculate damages, the court must determine the period in which a claimant would have worked at Joe's but for the discriminatory action. In making this determination, the court has considered the work history of each claimant coupled with the claimant's testimony and other relevant evidence. Included in this evidence is statistical data submitted by Dr. James T. McClave, Joe's expert in statistics and econometrics, showing a high attrition rate for the restau-

rant's servers. *See* Def.'s Ex. 35, tbl. A–2. From this evidence, Joe's argued that the period of back pay for any successful claimant should be limited to the period established by the cohort's profile (a statistical profile developed from the work histories of servers hired at the roll call at which a claimant would have been hired but for the discrimination). The court, however, has rejected this approach, finding it too mechanistic and impersonal, and in contravention of the well-settled principle that a successful Title VII plaintiff is entitled to be made whole. *See, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Title VII damage awards are meant to compensate real people with individual characteristics, documented work histories and identifiable injuries. While statistical evidence has long been admissible in Title VII actions, *see, e.g., Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364 (5th Cir.1974), it must be weighed against credible evidence which distinguishes an individual claimant. As an example, one claimant in this case worked for twenty years for a single employer. Two other claimants remained with their employers for periods of eight and ten years respectively. In an industry where high attrition is the norm, a claimant's history of long-term employment is highly significant and, in the court's judgment, outweighs the value of a cohort's profile, which, after all, is nothing more than a composite of other peoples' work histories.

9. *See supra,* n. 6.

■ 8. In September of 1993, Catherine Stratford opened a restaurant called "Picnics on the Beach." The business did not generate a profit in 1993, 1994, or 1995. Consequently, Ms. Stratford earned nothing in these periods. The court finds, however, that Ms. Stratford's effort to start her own business represented a good faith effort on her part to improve her financial position and, as a matter of law, constituted a reasonable method of mitigating her damages. Furthermore, the court finds that it was reasonable for her to continue operating "Picnics on the Beach" during the years it was not generating a profit because there existed a reasonable likelihood that it would become profitable in the future.

■ 9. If Ms. Stratford had been employed at Joe's during its seven-month operating season, she would have had the opportunity to engage in off-season employment. The court finds that she would have utilized this opportunity to earn a minimum of three thousand dollars during each of the five-month off-season periods.[10]

■ 10. A comparison of Ms. Stratford's actual earnings with what she would have earned at Joe's, *i.e.*, salary and tips, fringe benefits, and imputed off-season income, shows that she incurred the following deficiencies: 1990 (Oct. 15th—Dec. 31st): $334; 1991: ($2,276);[11] 1992: $5,683; 1993: $14,333; 1994: $24,584; and 1995: $26,215. Thus, had Ms. Stratford not been the victim of sex discrimination, she would have earned $71,149 more than she actually earned.

### *Raquel Munoz*

■ 11. Raquel Munoz intended to apply for work at Joe's long before the October 1989 roll call. She was dissuaded from applying, however, when she became aware of Joe's reputation for not hiring female food servers. L.Tr. 583–87 and 595–99. Based upon Ms. Munoz's testimony regarding her qualifications as a food server[12] and upon the

---

**10.** To reach a final calculation on damages, one must subtract actual earnings from the amount that would have been earned had the defendant employer not engaged in discriminatory conduct. *See, e.g.,Darnell v. City of Jasper,* 730 F.2d 653 (11th Cir.1984). At the trial on damages, Joe's argued that this formula requires the court to subtract what each claimant actually earned during a twelve-month period from the sum that each claimant would have earned during a seven-month season at Joe's. The EEOC disagreed, contending that, to "balance the equation," a reasonable figure for off-season income should be added to Joe's seven-month income figure. To support this contention, the EEOC offered expert testimony suggesting that $5,000 should be imputed as off-season income for each claimant. *See* Pl.'s Ex. 15. Indeed, the EEOC's expert noted that the $5,000 figure originated with Dr. McClave, Joe's expert, and was used by Joe's during the liability trial when the restaurant claimed that its servers earned between $25,000 and $50,000 a year. L.Tr. 2355. In view of the five-month difference between the two work periods, the court concludes that an adjustment is required. Two options suggest themselves. First, a reasonable figure for off-season income could be imputed to a claimant who demonstrated a willingness to pursue such employment. Second, a claimant's actual twelve-month's earnings could be reduced by five-twelfths, thus ensuring that seven months of actual earnings would be subtracted from seven months of Joe's earnings. To evaluate these approaches, the court performed both calculations and found that the latter often generated sums in excess of the EEOC's $5,000 figure. While these numbers are

valid as verifiable earned income, they are derived from regular full-time employment and, therefore, almost certainly overstate what could be earned from temporary off-season employment. Accordingly, the court concludes that the better approach is to start with the sum earned during Joe's seven-month season, add a reasonable amount for imputed off-season earnings and subtract the claimant's actual twelvemonth's earnings. In determining an amount to be imputed for off-season earnings, the court considered multiple factors, *viz.,* the duration of the off-season (five months), the claimant's level of experience, work history and demonstrated earning capacity, and the amount actually earned by the claimant from full-time employment during the off-season.

**11.** A figure in parentheses indicates an amount earned by a claimant which exceeds the amount that a server at Joe's would have earned in the same period. In other words, the claimant earned more money in this period than she would have earned at Joe's. An amount in parentheses, therefore, is not included in the computation of a back pay award. "[B]ecause a discriminatee has a duty to minimize damages and because alternative employment opportunities will sometimes prove more economically rewarding than the position sought, back pay awards are limited to proven economic loss." *Darnell,* 730 F.2d at 656.

**12.** *See generally* L.Tr. 571–602. Specific examples of Ms. Munoz's relevant experience include: approximately 15 years of wait staff experience

testimony offered by Joe's regarding the criteria used in hiring food servers,[13] the court finds that Ms. Munoz was fully qualified in 1989 to work as a food server at Joe's. If Ms. Munoz had applied and been hired in October of 1989, she would have continued to work at Joe's through 1996.[14]

12. In 1991, Ms. Munoz learned that Joe's was under investigation for discriminating against female applicants for food server positions. Therefore, she attended the October 1991 roll call and was interviewed for a food server's position. Ms. Munoz was fully qualified for the position[15] but was not selected because the hiring panel engaged in sex discrimination.

13. Ms. Munoz actually earned these amounts: 1989 (Oct. 15th—Dec. 31st): $3,625; 1990: $7,068; 1991: $17,004; 1992: $25,645; 1993: $25,015; 1994: $19,235; 1995: $21,586; and 1996: $16,842. *See* Pl.'s Exs. 9 and 32(b).

14. If Ms. Munoz had been employed at Joe's during its seven-month operating season, she would have had the opportunity to engage in off-season employment. The court finds that Ms. Munoz would have utilized this opportunity in all years except 1990, and would have earned a minimum of three thousand dollars during each of the five-month off-season periods. In 1990, Ms. Munoz refrained from working from May through September because of a difficult pregnancy. She returned to work shortly after the birth of her son. D.Tr. 147.

15. A comparison of Ms. Munoz's actual earnings with what she would have earned at Joe's, *i.e.*, salary and tips, fringe benefits, and imputed off-season income, shows that she incurred the following deficiencies: 1989 (Oct. 15th—Dec. 31st): ($627); 1990: $7,082; 1991: $3,094; 1992: ($1,462); 1993: $1,318;

1994: $5,349; 1995: $4,629; and 1996: $13,758. Thus, had Ms. Munoz not been the victim of sex discrimination, she would have earned $35,230 more than she actually earned.

### Carol Coyle

16. Carol Coyle worked as a food server at the Diplomat Hotel in Hollywood, Florida from 1971 until 1991. Sometime in the fall of 1991, she went to Joe's and was interviewed in a "mini-roll call," a process in which a small group of people, (in this instance about twelve), were interviewed by a three-person panel. During this process, Ms. Coyle took and passed the mandatory tray test. In making this finding, the court notes a conflict in the evidence on when the tray test was first administered. Dennis Sutton, Joe's assistant maitre d' and a member of the interview panel, initially said it was given first in " '91, I think." L.Tr. 1422. Later, Mr. Sutton suggested that the test may have been given first in 1992. L.Tr. 1711–12. Ms. Coyle, on the other hand, testified that she took the tray test in 1991. D.Tr. 178–80 and 197–201. There is also a conflict in testimony regarding when Joe's held the first mini-roll call. Anthony Arneson, Joe's lunchtime maitre d', testified that it occurred in February of 1993, D.Tr. 1885, whereas Ms. Coyle testified that one took place in 1991. Based upon the court's ability to observe the demeanor of the witnesses and to consider other criteria for judging their credibility, the court finds Ms. Coyle's testimony to be credible and worthy of belief. Based upon Ms. Coyle's testimony regarding her qualifications as a food server[16] and upon the testimony offered by Joe's regarding the criteria used in hiring food servers,[17] the court finds that Ms. Coyle was fully qualified in 1991 to work as a food server at

---

at the time of her application for employment at Joe's, L.Tr. 573, including experience at a large establishment, L.Tr. 579, "head waitress" experience at an "upscale" establishment with "elegant" clientele, L.Tr. 595, 581, and experience carrying large trays, containing as many as 11 plates, L.Tr. 582.

13. *See supra*, n. 7.

14. *See supra*, n. 8.

15. *See supra*, n. 12.

16. *See generally* L.Tr. 637–72. Specific examples of Ms. Coyle's relevant experience include: approximately 20 years of wait staff experience at the time she applied at Joe's, L.Tr. 639, including "tuxedo" and "single service" experience at an establishment with a capacity in excess of 300 persons, L.Tr. 640–41. Ms. Coyle's experience also included carrying stacks of up to 6 covered plates. L.Tr. 640, 642.

17. *See supra*, n. 7.

Joe's, however she was not selected because the hiring panel engaged in sex discrimination. If Ms. Coyle had been hired by Joe's in 1991, she would have continued in this employment through 1995.[18]

17. Ms. Coyle actually earned these amounts: 1991 (Oct. 15th—Dec. 31st): $3,484; 1992: $18,000; 1993: $20,900; 1994: $22,400; and 1995: $22,400.

18. If Ms. Coyle had been employed at Joe's during its seven-month operating season, she would have gained temporary employment in the off-season, earning a minimum of three thousand dollars in each of the five-month periods.

19. A comparison of Ms. Coyle's actual earnings with what she would have earned at Joe's, i.e., salary and tips, fringe benefits and imputed off-season income, shows that she incurred the following deficiencies: 1991: ($664); 1992: $3,881; 1993: $5,433; 1994: $2,184; and 1995: $3,815. Thus, had Ms. Coyle not been the victim of sex discrimination, she would have earned $15,313 more than she actually earned.

### Dawn Keon

 20. Dawn Keon stopped at Joe's twice in the fall of 1991 and completed an application for a food server's position. However, she did not attend the October 1991 roll call nor those held in subsequent years. Ms. Keon left Miami Beach in 1992 and moved to Broward County. After evaluating the evidence, the court finds that Ms. Keon failed to prove that she was a victim of sex discrimination. Her testimony that she became aware of Joe's reputation for not hiring female food servers is credible. Nonetheless, the court finds that she was not dissuaded by this information from reapplying at Joe's. She left Miami Beach for reasons unconnected with her failure to obtain employment at Joe's. Finally, based upon a review of Ms. Keon's work experience, the court finds that she failed to establish that she was fully qualified to perform the requirements of a food server at Joe's. Accordingly, Ms. Keon is not entitled to an award of money damages.

### Teresa Romanello

 21. As early as 1987, Teresa Romanello learned from multiple sources that Joe's did not hire female food servers. She desired to work at Joe's but was dissuaded from applying because of Joe's reputation. L.Tr. 217–23 and 280–81. Based upon Ms. Romanello's testimony regarding her qualifications as a food server[19] and upon the testimony offered by Joe's regarding the criteria used in hiring food servers,[20] the court finds that Ms. Romanello was fully qualified in 1989 to work as a food server at Joe's. If she had applied and been hired in October of 1989, Ms. Romanello would have worked at Joe's through 1996.[21]

22. Ms. Romanello attended the October 1993 roll call and was interviewed for a food server's position. Although fully qualified to work at Joe's, she was not selected because Joe's hiring personnel engaged in sex discrimination and gave her a lower rating than she deserved.

23. Ms. Romanello actually earned these amounts: 1989 (Oct. 15th—Dec. 31st): $3,979; 1990: $19,500; 1991: $19,500; 1992: $19,500; 1993: $20,000; 1994: $20,000; 1995: $20,500; and 1996: $17,000.

 24. If Ms. Romanello had been employed at Joe's during its seven-month operating season, she would have had the opportunity to engage in off-season employment. The court finds that she would have utilized this opportunity and earned a minimum of three thousand dollars during each five-month period except for 1996.[22]

18. *See supra*, n. 8.

19. *See generally* L.Tr. 199–302. Specific examples of Ms. Romanello's relevant experience include approximately 13 to 14 years of wait staff experience at the time she applied for a position at Joe's, L.Tr. 216–17, including approximately four years of experience at an elegant and large establishment, featuring "single service" where members of the wait staff carried trays weighing up to 50 pounds, L.Tr. 211–13.

20. *See supra*, n. 7.

21. *See supra*, n. 8.

22. Ms. Romanello testified that when the Sea Shanty, a restaurant she had worked at since 1986, closed on June 5th, 1996, she decided to take some time off. She cited the normal summer slow down and the fact that her husband had won $20,000 in the lottery. D.Tr. 429, 439 and 468. Thus, she removed herself from the

25. A comparison of Ms. Romanello's actual earnings with those that she would have earned at Joe's, *i.e.*, salary and tips, fringe benefits and imputed off-season income, reveals the following: 1989 (October 15th through December 31st): ($981); 1990: ($2,350); 1991: $598; 1992: $4,683; 1993: $6,333; 1994: $4,584; 1995: $5,715; and 1996: $10,600. Thus, had Ms. Romanello not been the victim of sex discrimination, she would have earned $32,513 more than she actually earned.

### Injunctive Relief

26. Joe's has taken some steps to eradicate sex discrimination from its hiring practices. For example, when first confronted with the allegations in this case, management substituted a three-person hiring panel for the previous single decision maker. Equally significant, the restaurant began to hire female food servers. At the same time, Joe's resisted the EEOC's request to advertise annual roll calls. This was especially important given Joe's reputation in the food serving community for discriminating against women. Furthermore, the restaurant adamantly refused to engage in a voluntary effort to add greater definition to the four criteria it used to select food servers. *See* Dckt. Entry 167. The court repeatedly voiced its concern that these criteria, *viz.*, appearance, articulation, attitude and experience, were too vague to provide adequate direction to the hiring staff and, therefore, played a role in the discrimination that occurred. Joe's yielded on this point only when the court threatened to prevent the restaurant from hiring additional servers until the hiring criteria were defined. *See* Dckt. Entry 190. In October 1997, at the court's insistence, Joe's instituted formal training for members of the interview panel and utilized a newly-developed server evaluation form. An evidentiary hearing and court order were required to force the restaurant to advertise the 1997 roll call. Joe's position throughout the litigation has been one of "combative denial." In light of the evidence produced,[23] and given the contentious history

---

workforce for five months. To account for this, the court has not imputed off-season income for 1996. The court, however, has declined to follow Joe's suggestion that Ms. Romanello's husband's lottery winnings should be attributed to her as earnings. *See* Def.'s Ex. 37 and D.Tr. 1761–65. Assuming that lottery winnings are marital property in which each spouse possesses an equitable interest, *see, e.g., In re Fordu,* 209 B.R. 854 (6th Cir. BAP 1997); *Panganiban v. Panganiban,* 1998 WL 40484, *10–12 (Conn.Super.); *Seizer v. Sessions,* 132 Wash.2d 642, 940 P.2d 261 (1997); *In re Marriage of Palacios,* 275 Ill.App.3d 561, 211 Ill.Dec. 915, 656 N.E.2d 107, 113 (1995), *appeal denied,* 165 Ill.2d 554, 214 Ill.Dec. 861, 662 N.E.2d 427 (1996), there is no justification for attributing the entire sum to the wife. More to the point, it is improper to characterize lottery winnings as earnings for purposes of back pay calculations. Under the collateral source doctrine, funds unrelated to the conduct at issue and received from third parties are not counted as mitigating earnings. *See, e.g., NLRB v. Gullett Gin Co.,* 340 U.S. 361, 364, 71 S.Ct. 337, 339, 95 L.Ed.2d 337 (1951) (court need not reduce back pay award by deducting state unemployment compensation benefits).

23. During the trial on damages and injunctive relief, the EEOC placed into evidence a two-inch black-and-yellow campaign button that Joe's management distributed to its serving staff in 1997. It states, "JOE'S STAFF, I AM GOVERNMENT APPROVED." *See* Pl.'s Ex. 31. Noting that the necessity for injunctive relief remained a contested issue, the EEOC argued that it was entitled to introduce evidence that provided insight into management's state of mind. As seen by the EEOC, management's action of distributing buttons to male servers who had been hired when Joe's discriminated against women demonstrated management's insensitivity to the serious issues in this case and evidenced its disdain for court-ordered remedial measures. Anticipating the EEOC's offer, Joe's filed a pre-trial motion to exclude any reference to the buttons. Counsel for the restaurant argued that campaign buttons are classic examples of free speech protected by the First Amendment. Joe's counsel further contended that the First Amendment shielded the statements and expressive conduct from criticism by the EEOC and from consideration by the court. No one can take issue with Joe's first premise; campaign buttons do enjoy First Amendment protection. *See, e.g., Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). But the suggestion that the First Amendment provides justification to suppress criticism is truly extraordinary. Indeed, Joe's formulation is antithetical to the core values of the First Amendment. "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market ...." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). It has long been recognized that a party in a civil proceeding may introduce into evidence statements and assertive conduct of an adverse party. *See* Fed.R.Evid. 801(d)(2)(A); *see also Bondie v.*

of this case, the court finds that the EEOC has established the necessity for mandatory injunctive relief. Joe's, on the other hand, has failed to demonstrate that, absent the strictures of a mandatory injunction, it can be relied upon to refrain from discriminatory conduct. Therefore, the court will enter a mandatory injunction governing Joe's employment practices and hiring decisions until January 1, 2001. This period is shorter than requested by the EEOC but, in the court's judgment, is of sufficient duration to allow remedial measures to take root.

Based on the foregoing, the court reaches the following:

## CONCLUSIONS OF LAW

Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e–2(a)(1) provides that "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." The aim of this legislation is "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of ... employees over other employees." *Albemarle Paper Company v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). As one method of enforcement, Congress bestowed upon the courts the power to award damages "as part of a complex legislative design directed at an historic evil of national proportions." *Id.* at 416, 95 S.Ct. 2362. The aim of a Title VII damages award is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.* at 418, 95 S.Ct. 2362. Accordingly, a broad range of

remedies is available to the court in fashioning a damages award.

 One component of a Title VII damage award is back pay, *i.e.,* the compensation that the plaintiff would have received from the employer had the discrimination not occurred. A prevailing plaintiff in a Title VII action is presumptively entitled to back pay. *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1472 (11th Cir.1985); *see also Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1526 (11th Cir.1991). Two overarching principles guide the computation of a back pay award: "(1) unrealistic exactitude is not required, [and] (2) uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer." *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 260–61 (5th Cir.1974) (citing *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1380 n. 53 (5th Cir.1974)). A district court may deny back pay only for reasons which are consistent with the central statutory purposes of Title VII noted above. *Albemarle Paper Co.,* 422 U.S. at 421, 95 S.Ct. at 2373. The fact that an employer may have lacked specific intent to discriminate, or, put differently, was acting in good faith, is not a defense to a back pay award. *Pettway,* 494 F.2d at 253.

Selecting the appropriate starting date is a critical decision in calculating back pay. The traditional rule is that back pay liability begins to accrue on the date of the discriminatory act, *see Velazquez v. Chardon,* 736 F.2d 831 (1st Cir.1984), but not earlier than two years prior to the filing of the charge of discrimination. *See* 42 U.S.C. § 2000e–5(g)(1). Thus, for example, in the case of an employee terminated because of illegal discrimination, the date of termination serves as the starting date to calculate back pay. *See, e.g., EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1509 (9th Cir.1989). A different rule applies,

---

*Bic Corp.,* 947 F.2d 1531 (6th Cir.1991). While it is axiomatic that a party may not be punished for having engaged in protected speech, a court is free to consider a party's speech if relevant to an issue in litigation. *See, e.g., United States v. Rosenberg,* 806 F.2d 1169 (3rd Cir.1986), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2465, 95 L.Ed.2d 873 (1987). In the case at bar, the

meaning of Joe's action of distributing campaign buttons is ambiguous. It is the court's view that the most plausible interpretation is that Joe's was putting a tongue-in-cheek publicity spin on what has been a difficult situation for a restaurant that is conscious of its public image. Accordingly, the court attaches no weight to this act in determining the necessity for future injunctive relief.

however, when a qualified employee was deterred from applying for employment because of the employer's reputation for engaging in discriminatory employment practices. The Supreme Court spoke to this issue in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and said:

> A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicized vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimina-

tion as is he who goes through the motions of submitting an application.

*Id.* at 365–66, 97 S.Ct. at 1870.

In the case at bar, Catherine Stratford, Raquel Munoz and Teresa Romanello are each entitled to the benefit of this rule. Each of these claimants was deterred from applying for a food server's position at Joe's by the restaurant's reputation for discriminating against women. The court has found that each of these applicants was fully qualified to work at Joe's and would have applied but for the knowledge of Joe's reputation. Under the rule announced in *Teamsters*, these applicants were not obliged to engage in the futile gesture of applying for a food server's position at Joe's when the restaurant was known to adhere to a policy of not hiring women. Consequently, an award of back pay for each of these applicants must be calculated from the date on which they were first deterred from applying at Joe's because of its reputation.[24]

Back pay damages normally are awarded through the date of judgment. *Nord*, 758 F.2d at 1473. The case at bar, however, presents an exception to the general rule. Here, the court has found that each of the claimants would have voluntarily terminated her employment at Joe's prior to the date of judgment. Therefore, the date of termination is the appropriate end point for calculating a back pay award. "Title VII should not put the prevailing claimant in a better position than similar employees who

---

24. The court discussed the rationale for admitting evidence of Joe's reputation in its opinion on liability. *See EEOC v. Joe's Stone Crab, Inc.*, 969 F.Supp. at 736. An additional brief comment, however, is in order. A predecessor judge announced his intention to bifurcate the trial, treating liability first and then, if necessary, damages. *See* Dckt. Entry 49, Status Conf. Hr'g Tr. at 7. Joe's was represented at the status conference and, in the pretrial stipulation, indicated its lack of objection to this procedure. *See* Dckt. Entry 98. During the trial on liability, when the EEOC offered testimony regarding Joe's reputation, Joe's counsel objected, citing "hearsay." L.Tr. 1728. The court overruled this objection, noting that the evidence was not being admitted to prove the charge of discrimination, but only to establish that Joe's had a reputation in the food servers' community for not hiring female food servers. Following the liability trial, the court

entered an order finding that the evidence on discrimination, which was separate and apart from the evidence about reputation, proved that Joe's discriminated against women. Thus, the evidence in the liability phase consisted of two components. One established that Joe's discriminated against women. The other proved that restaurant workers in the Miami area were well aware of Joe's discriminatory practices. During the subsequent trial on damages, Joe's attempted to offer evidence to rebut the previously-admitted reputation evidence. The court sustained the EEOC's objection, finding that the liability phase was over, that Joe's had waited too long and that the testimony was not relevant to the issue of damages. The court, however, did allow Joe's to offer evidence about its present reputation, finding it relevant to the issue of whether further injunctive relief was necessary.

were not discriminated against, but conversely [she] should not be disadvantaged." *Weaver*, 922 F.2d at 1527. Put another way, a Title VII damage award should make the claimant whole, not confer a windfall. When the evidence establishes that a claimant would have terminated her employment voluntarily prior to the date of judgment, the earlier date must be used for back pay calculations. In circumstances such as these, "[t]he court must 'do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred.'" *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1580 (7th Cir.1997) (reversing back pay award where evidence showed that employee intended to quit her job before she was illegally terminated) (quoting *United States v. City of Chicago*, 853 F.2d 572, 575 (7th Cir.1988)).

Back pay encompasses more than salary and tips. Fringe benefits such as vacation, sick pay, insurance and retirement benefits are included as well. *Pettway*, 494 F.2d at 263; *see also Crabtree v. Baptist Hosp. of Gadsden, Inc.*, 749 F.2d 1501 (11th Cir.1985). Because Joe's provided health insurance and profit sharing, which have been valued in paragraph 3, *supra*, these sums are properly included as part of each claimant's back pay award.

As previously noted, an award of back pay is intended to make the claimant whole, not to confer a windfall. To this end, Title VII provides: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g)(1). Thus, in calculating a back pay award, the trial court must determine what the employee would have earned had she not been the victim of discrimination, and must subtract from this figure the amount of actual interim earnings. Moreover, this calculation must be performed according to a quarterly earnings formula which has gained court approval. *See Darnell v. City of Jasper*, 730 F.2d 653, 656–57 (11th Cir.1984). The totals reflected in ¶¶ 10, 15, 19 and 25 have been computed in accordance with this approach.

To be eligible for a back pay award, a claimant must mitigate her damages by seeking employment "substantially equivalent" to the position she was denied. *Weaver*, 922 F.2d at 1527. "'Substantially equivalent employment' is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which the Title VII claimant has been discriminatorily terminated. If the former employee cannot find substantially equivalent employment, [she] may 'lower [her] sights' and accept noncomparable employment." *Id.*

While every claimant has a duty to exercise reasonable diligence in attempting to mitigate damages, the defendant has the burden of proving that a claimant has failed to discharge her duty. *See Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir.1992). Thus, a defendant must show that a claimant did not make reasonable efforts to obtain comparable work, or that comparable work was available and the claimant did not seek it out. *Sellers v. Delgado Community College*, 839 F.2d 1132, 1139 (5th Cir.1988). Joe's attempted to satisfy this burden by contending that Catherine Stratford's decision to become self-employed by opening a restaurant did not constitute a reasonable effort to obtain comparable work. Case law, however, suggests that a claimant's decision to become self-employed may constitute reasonable diligence for purposes of the back pay determination. *See, e.g., Nord*, 758 F.2d at 1471 (finding it reasonable for plaintiff to turn her attention to setting up a business with her husband after searching unsuccessfully for employment); *Smith*, 969 F.2d at 438 ("The notion that starting one's own business cannot constitute comparable employment for mitigation purposes not only lacks support in the cases, but has a distinctly un-American ring."); *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005 (3d Cir.1988) (plaintiff's choice to start his own business was reasonable method to mitigate damages); and *Taylor v. Central Penn. Drug and Alcohol Servs. Corp.*, 890 F.Supp. 360, 372–73 (M.D.Pa.1995) (effort to mitigate back pay damages by starting own

business was laudable effort and did not constitute voluntary withdrawal from labor market).

 A self-employed person is "employed" for the purposes of mitigating damages if establishing a business of his own was a reasonable alternative to finding other comparable employment. *Carden,* 850 F.2d at 1005. The claimant's duty to mitigate does not require success, but only "an honest, good faith effort." *Smith,* 969 F.2d at 438. In *Smith,* for example, a discharged plaintiff initially sought employment through an agency and newspaper listings. Within a short time—approximately a week—she began planning her own restaurant enterprise. In the final analysis, Smith's restaurant did not show a net profit until its third year, but its gross revenues were increasing. Smith's efforts in opening and operating her restaurant "were serious and in fact much *greater* than required by an ordinary full-time job." *Id.* (emphasis in original). The jury awarded Smith back pay for thirty-four months. In affirming the jury's verdict, the Court of Appeals stated:

> Given that Smith's decision to open her own restaurant was a reasonable effort at alternative employment, we must ask whether such self-employment remained reasonable for the entire period covered by the jury's award. The [statute] must not be used as a tool for insuring a plaintiff's fledgling business while it continues to sustain losses. Damages should ordinarily extend only to the date upon with 'the sting of any discriminatory conduct [has] ended.'

*Id.* at 438–39 (citation omitted). Thus, unprofitability during the initial stages of operation will not, by itself, establish that the enterprise was an unreasonable method of mitigating damages. *See also Nord,* 758 F.2d at 1472 (claimant entitled to back pay for six to eight months spent initiating own business without remuneration).

 The burden to prove that the claimant's decision to open her own business was not a reasonable method of mitigating damages falls on the defendant. *Carden,* 850 F.2d at 1005. In the case at bar, Joe's failed to sustain this burden. It proved only that Ms. Stratford's business ultimately failed. Accordingly, as noted in paragraph 8, *supra,* the court concludes that Catherine Stratford satisfactorily established that she reasonably attempted to mitigate her damages by starting her own business.

 "Title VII authorizes prejudgment interest as part of the backpay remedy .... The backpay award authorized by [Title VII] is a manifestation of Congress' intent to make persons whole for injuries suffered through past discrimination. Prejudgment interest, of course, is an element of complete compensation." *Loeffler v. Frank,* 486 U.S. 549, 558–59, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988) (internal quotation marks and citations omitted); *see also EEOC v. Guardian Pools, Inc.,* 828 F.2d 1507 (11th Cir.1987); *Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931 (1st Cir.1995). An award of prejudgment interest adjusts the back pay award for inflation and reflects the present day value of income that should have been paid to the claimant in the past. To determine the appropriate interest rate, courts have traditionally turned to the National Labor Relations Act (NLRA) for guidance. *See e.g., Brown v. A.J. Gerrard Mfg. Co.,* 715 F.2d 1549 (11th Cir.1983) (en banc) (per curiam). Under the NLRA there has been a consistent practice of awarding prejudgment interest on back pay awards. Furthermore, in 1977, the National Labor Relations Board adopted the Internal Revenue Service's (IRS) prime rates and rejected the traditional flat six percent interest rate. The Eleventh Circuit has held that the IRS prime rates are to be used to calculate the amount of prejudgment interest on back pay awards in Title VII cases. *See Guardian Pools, Inc.,* 828 F.2d at 1512. Accordingly, in the exercise of its discretion, the court concludes that each of the claimants is entitled to prejudgment interest on their back pay award, and the court shall reserve jurisdiction to receive additional evidence on the calculation of prejudgment interest. *See, e.g., Taylor,* 890 F.Supp. at 369(citing *Guardian Pools* and approving adoption of IRS overpayment rates pursuant to 26 U.S.C. § 6621(a)(1) as better reflecting lost investment opportunities).

 A prevailing plaintiff in a Title VII action is also presumptively entitled to reinstatement or, if that is impracticable, front pay in lieu of reinstatement. *See Nord,*

758 F.2d at 1473 (district court must set forth circumstances warranting denial of reinstatement or front pay) and *Weaver*, 922 F.2d at 1528. Because a monetary award of front pay is calculated to end on the date that the discrimination victim attains the position she would have been in but for the discrimination, front pay is appropriate only when the other damages awarded do not fully compensate the plaintiff. *Weaver*, 922 F.2d at 1529. Inasmuch as the court previously determined that each of the claimants in the case at bar would have voluntarily terminated her employment at Joe's prior to the date of the entry of final judgment, neither reinstatement nor front pay is warranted.

The Supreme Court has ruled that back pay awards are taxable under the Internal Revenue Code. *United States v. Burke*, 504 U.S. 229, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). Consequently, a district court, in the exercise of its discretion, may include a tax component in a lump sum back pay award to compensate prevailing Title VII plaintiffs. *Sears v. Atchison, Topeka & Santa Fe Ry.*, 749 F.2d 1451, 1456 (10th Cir.1984) (particularly appropriate where protracted litigation was involved). This accords with a prevailing practice in the settlement of Title VII suits which commonly include an amount to offset the plaintiff/taxpayer's increased liability. In the case at bar, however, the EEOC failed to provide sufficient competent foundation evidence to permit the court to make these calculations. Therefore, the court declines to award money damages to offset whatever increased tax liability a claimant will experience by receiving a lump sum award.

Where discrimination in violation of Title VII occurs, the district court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372. Toward the end of preventing past discrimination from recurring, victims of employment discrimination are generally entitled to an injunction against future discrimination. The exception to this general rule is when the employer proves that it is unlikely to repeat the discriminatory practice or practices. *See, e.g., Hacienda Hotel*, 881 F.2d at 1519. An employer that undertakes curative steps only after it has been sued for its discriminatory conduct does not thereby "provide sufficient assurances that it will not repeat the violation to justify denying an injunction." *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir.1987).

### DECRETAL PROVISIONS

Accordingly, it is **ORDERED, ADJUDGED and DECREED** that:

(1) Upon conclusion of the hearing to determine the amount of prejudgment interest, a final judgment will be entered in favor of Catherine Stratford and against Joe's Stone Crab, Inc. for the sum of $71,149 plus prejudgment interest.

(2) Upon conclusion of the hearing to determine the amount of prejudgment interest, a final judgment will be entered in favor Raquel Munoz and against Joe's Stone Crab, Inc. for the sum of $35,230 plus prejudgment interest.

(3) Upon conclusion of the hearing to determine the amount of prejudgment interest, a final judgment will be entered in favor of Carol Coyle and against Joe's Stone Crab, Inc. for the sum of $15,313 plus prejudgment interest.

(4) Upon conclusion of the hearing to determine the amount of prejudgment interest, a final judgment will be entered in favor of Teresa Romanello and against Joe's Stone Crab, Inc. for the sum of $32,513.

(5) Upon the filing of this memorandum opinion, and pursuant to Rule 58, Fed.R.Civ. P., the clerk shall enter final judgment in favor of the EEOC and against Joe's Stone Crab, Inc., permanently enjoining Joe's Stone Crab, Inc. from discriminating against female applicants for food server positions. To this end, Joe's Stone Crab, Inc. is further ordered to implement and adhere to these requirements:

(A) Within twenty days of the entry of this order, the directors of Joe's Stone Crab, Inc., shall convene a formal meeting and adopt a corporate resolution indicating that

Joe's is an equal opportunity employer and shall conduct its hiring practices in accord with the requirements of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1). While the resolution may indicate Joe's corporate employment policy of not discriminating on the basis of race, color, religion, sex, or national origin, it shall expressly state Joe's policy of not discriminating on the basis of sex in the hiring of food servers.

(B) An authenticated copy of the corporate resolution shall be filed with the clerk of court and provided to the EEOC within five days of its adoption.

(C) The corporation's policy shall be communicated orally and in writing to all subordinates involved in the process of hiring food servers.

(D) The corporation's policy shall be announced by management during the opening remarks at the annual roll call.

(E) For the period between the date of the entry of this order and January 1, 2001, Joe's shall follow the practices and procedures that were ordered by this court for the conduct of the October 1997 roll call. During the period between the date of the entry of this order and January 1, 2001, Joe's shall not alter the method by which it evaluates and hires applicants for food server positions without obtaining prior approval of this court.

(F) Until January 1, 2001, Joe's shall inform all individuals selected by the restaurant for a food server's position that the offer of employment is deemed conditional and shall not be final unless and until this court approves the report submitted by the court-appointed monitor.

(G) Upon the entry of this order, Joe's shall authorize and bear the costs associated with the completion of a criterion-related validation study of the evaluation criteria used to select and hire food servers. This study shall be conducted by an industrial psychologist and shall be completed within thirty months of the entry of this order. A copy of the study and its results shall be filed with the court, and provided to the EEOC.

(H) The roll calls to be conducted in 1998, 1999, and 2000 shall conform with the following requirements:

(i) Roll calls shall be advertised in the Miami Herald and the Sun–Sentinel in the Friday, Saturday and Sunday editions on the two weekends preceding the roll call. They shall be advertised in the New Times, a weekly publication, during the two weeks immediately preceding the roll call. The content, size of the overall advertisement, and size of the print in the advertisement shall be the same as that introduced into evidence in this case. See Def. Ex. 28.

(ii) For the two-week period in which the advertisements appear in the press, Joe's shall maintain a recorded call-in information line. The information provided in the recorded message shall be filed with the court and provided to the EEOC.

(iii) Joe's interview panel shall consist of at least three persons. Prior to the day of roll call, the members of the interview panel and designated alternates shall participate in a training session conduced by Dr. Karl Galen Kroeck, or a substitute industrial psychologist. Each training session, which shall last a minimum of four hours, shall utilize the server interview training manual and server interview evaluation form developed by Dr. Kroeck. In addition, each session shall include mock interviews with live applicants.

(iv) The restaurant entrance to be used by applicants at the roll call shall be marked clearly and other entrances shall be marked to direct applicants to the proper door.

(v) By 8:00 a.m. on the day of the roll call, Joe's shall post a sign-up sheet outside the appropriate entrance. After applicants have been admitted to the restaurant, and following management's introductory comments, applicants shall be interviewed in the order in which they arrived and signed-in. Only applicants who arrived before the delivery of the management's introductory comments shall be entitled to be interviewed. Applicants not present when called for an interview shall not be entitled to a later interview.

(vi) Joe's may decline to interview any applicant who does not qualify for em-

ployment pursuant to Joe's corporate policy, *e.g.,* a recently discharged employee.

(vii) All applicants shall be required to take and pass a standardized tray test. Applicants who pass the tray test shall be interviewed by the three-person panel. Each panel member interviewing and evaluating applicants for food server positions shall utilize the server interview training manual and the server interview evaluation form developed by Dr. Kroeck. *See* Def.'s Ex. 33.

(viii) In addition to other requirements established by law, Joe's shall retain all applications, scoring sheets and other documentation used during the hiring process. Joe's shall make this documentation available to the EEOC for inspection and copying within seventy-two hours of the completion of the roll call.

(ix) A court-appointed monitor shall attend the roll calls. The monitor shall be appointed in a separate order and shall be compensated by Joe's pursuant to the terms of the court's order. Within five days of the completion of the roll call, the monitor shall file a written report indicating the total number of applicants interviewed, their gender, the total number of servers selected by Joe's, and their gender. A copy of the report shall be provided to each party at the time of filing. Each party shall have ten days from the receipt of the report to file objections to the practices, procedures and hiring decisions reached at the roll call. No decision reached at the roll call shall be deemed final until the court has ruled upon objections following the monitor's report. If necessary, the court will conduct a hearing on these issues.

(x) The EEOC shall be entitled to have up to two observers present at the roll calls.

(6) The court shall reserve jurisdiction over the cause and the parties to enforce the terms and conditions of injunctive relief, and to assess costs in favor of the EEOC.