Jennifer L. **JOHNSON**, Plaintiff,

v.

**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA d/b/a University of Georgia, Defendant,**

**and**

**Antoine Hester, et al., Defendant–Intervenors.**

**Aimee Bogrow and Molly Ann Beckenhauer, Plaintiffs,**

**v.**

**Board of Regents of the University System of Georgia d/b/a University of Georgia, Defendant,**

**and**

**Antoine Hester, et al., Defendant–Intervenors.**

**Nos. 499CV169, 499CV181.**

United States District Court, S.D. Georgia, Savannah Division.

July 24, 2000.

1364

John M. Tatum, Hunter, Maclean, Exley &
Dunn, Savannah, GA, A. Lee Parks, R.
Mason Barge, John W. Bellflower, Jr.,
Parks, Chesin & Miller, PC, Atlanta, GA,
for Plaintiffs.

Dennis R. Dunn, Atlanta, GA, Alfred L. Evans, Jr., Senior Asst. Atty. Gen., Atlanta, GA, Mark H. Cohen, Michael D. Kaufman, Troutman Sanders LLP, Atlanta, GA, Rodney K. Strong, Griffin & Strong, Atlanta, GA, for Defendants.

Dennis D. Parker, Victor A. Bolden, Theodore M. Shaw, Elise C. Boddie, NAACP Legal Defense & Educational Fund, Inc., New York City, Ivory Kenneth Dious, Kenneth Dious & Assoc., Athens, GA, for Defendant–Intervenors.

### ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

Plaintiffs brought these consolidated [1] actions to challenge the legality of the University of Georgia's (UGA's) 1999 admissions process, specifically the parts that rely upon an applicant's race and gender. Doc. # 1. A group of high school and UGA students intervened. Doc. # 75. The Court dismissed some claims and defendants on procedural grounds. *See* doc. # # 55, 99, 114, 160. The individual plaintiffs assert that defendant UGA's 1999 freshman admissions program violated 42 U.S.C. § 2000d (Title VI), and 20 U.S.C. § 1681 (Title IX). Doc. # 160. They seek money damages and an injunction ordering their admission. Doc. # 130 at 2.

The plaintiffs, UGA, and the intervenors now each move separately for summary judgment.[2] Doc. ## 130, 121, 117. In that the plaintiffs lack standing to seek forward-looking relief, *see* doc. # 99 at 5–8, the Court here addresses only the legality of UGA's *1999* freshman admissions program.

## II. BACKGROUND

UGA subjected its 1999 freshman-class candidates to a three-layer evaluation process: Academic Index (AI), Total Student Index (TSI), and Edge Reading (ER). Doc. # 8 ¶ 7; doc. # 20 ¶ 7. It calculated AIs by using each applicant's high school academic GPA and standardized test (SAT or ACT) scores. Doc. # 8 ¶ 8. For 1999, UGA automatically admitted applicants having a minimum 2.86 AI (or 2.81 if derived from a "most difficult" high school curriculum), as well as a specified minimum SAT score. Doc. # 20 ¶ 9; doc. # 38 ¶ 30.

UGA next used the TSI to re-rank those applicants not automatically admitted but with AIs above 2.40. Using each applicant's AI as a starting point, UGA then re-ranked them by adding to that score various "plus factors" or "points" for certain characteristics. These included being non-white and male. Doc. # 8 ¶¶ 9–10; doc. # 20 ¶¶ 9–10. Non-whites received .5 TSI points and males received .25 TSI points (hence, a non-white male received .75). Doc. # 20 ¶¶ 11–12. UGA then denied admission to students with TSIs below 4.66 and admitted those with TSIs above 4.92. Doc. # 8 ¶ 15; doc. # 20 ¶ 16.

Finally, the university subjected 4.66–4.92 TSI applicants to the ER process, where "readers" scrutinize those at the "edge" of the admissions pool for "qualities that might not have been apparent at the AI and TSI stages...." *Tracy v. Bd. of Regents,* 59 F.Supp.2d 1314, 1317 (S.D.Ga. 1999); doc. # 1 ¶ 23; doc. # 38 ¶¶ 18–19.

Plaintiff Jennifer L. Johnson achieved a 4.10 TSI. Since she is a white female, UGA did not grant her the .5 racial or .25 gender points accorded to minority male appli-

---

**1.** The Court consolidated *Bogrow v. Board of Regents,* 499CV181 (S.D.Ga. Complaint filed 8/31/99) (*Bogrow* ) and *Johnson v. Board of Regents,* 499CV169 (S.D.Ga. Complaint filed 8/10/99) (*Johnson* ). *See Johnson,* 499CV169, doc. # 55. In this Order, the Court will cite to the pre-consolidation record in *Johnson* unless it indicates otherwise.

**2.** The Court applies the summary judgment standards exhaustively detailed in *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993), and *Mize v. Jefferson City Board of Education,* 93 F.3d 739, 742–43 (11th Cir. 1996).

cants. Doc. # 8 ¶ 14. Because her TSI was below 4.66, it denied her admission outright (i.e., without ER-phase review). Doc. # 20 ¶ 17. Had UGA granted her the .75 "bonus points," her resulting 4.85 TSI would have qualified her for ER consideration. Three days after Johnson brought this action, UGA admitted her. *Id.; doc. # 1.*

Plaintiffs Aimee Bogrow and Molly Ann Beckenhauer achieved 4.52 and 4.06 TSIs respectively. Doc. # 38 ¶¶ 38, 42. As with Johnson, UGA awarded neither the .75 race/gender bonus points. *Id.* ¶ 43. Had it done so, Bogrow would have been admitted, and Beckenhauer would have qualified for ER consideration. However, without the bonus points, they did not make the 4.66 TSI cut-off, so UGA denied them admission. *Id.* ¶¶ 38, 42–43.

## III. *ANALYSIS*

### A. Governing Standards

#### 1. *Title VI Claim*

■ The plaintiffs contend that UGA's use of a racial preference in the TSI phase of its admissions process violates § 601 of Title VI.[3] Section 601 states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. A claim arising under this statute, "just like a claim arising under the Equal Protection Clause of the Fourteenth Amendment ... must establish the funding recipient's discriminatory intent." *Sandoval v. Hagan,* 197 F.3d 484, 501 (11th Cir.1999).

■ Moreover, "Title VI's definition of racial discrimination is absolutely coexten-

sive with the Constitution's." *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 352, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Brennan, White, Marshall, and Blackmun, JJ.); *see also Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 610–11, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Powell, J., concurring) (noting that this view held a majority in *Bakke*). Therefore, a Title VI statutory claim is analyzed identically to an equal protection claim. *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1405–06 n. 11 (11th Cir. 1993) ("Since Title VI itself provides no more protection than the equal protection clause—both provisions bar only intentional discrimination—we will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis").

Accordingly, since the parties do not dispute that UGA receives federal funds, or that its admissions policy considers applicants' race, the plaintiffs will prevail on their Title VI claim unless UGA demonstrates that its use of racial bonus points can survive strict scrutiny. That is, it "must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 235, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The Court addresses UGA's showing on this in Part III(B) infra.

#### 2. *Title IX Claim*

■ The plaintiffs' remaining claim, challenging UGA's gender preference, arises under Title IX.[4] This law provides in part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

---

3. The Court previously denied plaintiffs' motion to add a claim challenging the ER process under 42 U.S.C. § 2000d–1 (§ 602 of Title VI), on the ground that it has a disparate racial impact. Doc. # 114 at 5–7. The Court also dismissed, on sovereign immunity/standing grounds, plaintiffs' § 1983, equal protection claims. Doc. # 160.

4. Again, the plaintiffs' equal protection claim against the gender preference, like their similar claim against UGA's racial bonus points, has been dismissed from the case. *See* doc. # 160.

any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a).

The plaintiffs and defendant agree that the standard for a Title IX violation is the same as that used for equal protection claims. *See* doc. # 122 at 46–47; doc. # 151 at 24. This result follows from the similarity between Title VI and Title IX. As the Supreme Court has stated:

> Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefited class.... The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been....

*Cannon v. Univ. of Chicago,* 441 U.S. 677, 694–96, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (footnotes omitted).

Thus, "it is settled that analysis of the two statutes is substantially the same." *Franklin v. Gwinnett County Pub. Schs.,* 911 F.2d 617, 619 (11th Cir.1990), *rev'd on other grounds,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). And since, as stated above, Title VI's discrimination prohibition is coextensive with the Equal Protection Clause's, it follows that Title IX's is also.

Some uncertainty arises, however, from the fact that the Equal Protection Clause has been interpreted to treat racial and sexual classifications differently. *See Jeldness v. Pearce,* 30 F.3d 1220, 1227 n. 4 (9th Cir.1994) (noting that a gender-based classification is upheld if the government can show that it is substantially related to an important governmental interest, but that racial distinctions must be narrowly tailored to achieve a compelling governmental interest). But, "[b]ecause Title IX and Title VI use the same language, they should ... be read to require the same levels of protection and equality." *Id.* at 1227; *Klinger v. Department of Corrections,* 107 F.3d 609, 614 (8th Cir.1997).

Therefore, the standard for finding gender discrimination under Title IX is the same as Title VI's standard for racial discrimination, which is identical to the Equal Protection Clause's standard for racial classifications—i.e., strict scrutiny. To defeat plaintiffs' Title VI and IX claims, then, UGA's asserted interest in "the promotion of diversity in higher education" (*see* doc. # 122 at 25) must be compelling, and its use of race and gender as two of several "plus factors" must be narrowly tailored to achieve that interest.

### B. Using Racial Preferences to Promote "Diversity"

#### 1. *The* Bakke *Case*

■ Relying upon Justice Powell's opinion in *Bakke,* UGA contends that the promotion of diversity in higher education is a State interest sufficiently compelling to justify race-conscious admissions. Doc. # 122 at 25. In *Bakke,* the Supreme Court invalidated the University of California at Davis's (UCD's) medical school admissions policy, which reserved a certain number of seats in each entering class for minorities. 438 U.S. 265, 269–71, 98 S.Ct. 2733, 57 L.Ed.2d 750. However, the Court was badly fractured in its reasoning. Four Justices (Brennan, White, Marshall, and Blackmun; hereafter the "Brennan group") would have held the admissions program to be constitutional. *Id.* at 324–26, 98 S.Ct. 2733. Four other Justices, in an opinion authored by Justice Stevens (the "Stevens group"), did not reach the constitutional issue because they felt that UCD's program violated Title VI. *Id.* at 411–12, 421, 98 S.Ct. 2733.

The remaining member of the Court, Justice Powell, authored an opinion in which no other Justice joined, but which announced the Court's judgment. *Id.* at 269–72, 98 S.Ct. 2733. He reached the constitutional issue and purported to apply a "most exacting judicial examination." *Id.* at 287–91, 98 S.Ct. 2733; *but see id.* at 305, 98 S.Ct. 2733 ("in order to justify the use of a suspect classification, a State must

show that its purpose or interest is both constitutionally permissible and substantial [as opposed to compelling], and that its use of the classification is necessary to the accomplishment of its purpose....") (quotes, cites, and ellipsis omitted).

In so doing, Powell opined that UCD's admissions plan violated the Fourteenth Amendment's Equal Protection Clause. *Id.* at 320, 98 S.Ct. 2733. But he specifically added that "a properly devised admissions program involving the competitive consideration of race and ethnic origin" could pass constitutional muster. *Id.* Thus, Powell's opinion joined the Stevens group in invalidating UCD's plan, but concurred with the Brennan group that UCD should not be enjoined from all consideration of race in its admissions process. *Id.* at 271–72, 98 S.Ct. 2733.

In reaching his conclusion that the UCD plan was unconstitutional, Powell considered UCD's argument that its plan was intended to attain for the school a diverse student body. He determined that this goal "clearly is a constitutionally permissible goal for an institution of higher education." *Id.* at 311–12, 98 S.Ct. 2733. Noting that "[t]he atmosphere of speculation, experiment and creation—so essential to the quality of higher education—is widely believed to be promoted by a diverse student body," *id.* at 312, 98 S.Ct. 2733 (quotes omitted), and that an "otherwise qualified medical student with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged—may bring to a [school] experiences, outlooks, and ideas that enrich the training of its student body," *id.* at 314, 98 S.Ct. 2733, Powell declared that "the interest of diversity is compelling in the context of a university's admissions program." *Id.*

Nevertheless, Powell concluded that UCD's plan was not necessarily related to its diversity interest, because that program, "focused *solely* on ethnic diversity, would hinder rather than further [the] attainment of genuine diversity." *Id.* at 315 (emphasis in original). "The diversity that

furthers a compelling state interest," he stated, "encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Id.*

In contrast, Powell approved of Harvard University's admissions plan, in which "race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats." *Id.* at 317. Such a program, Powell determined, "is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Id.* The TSI phase of UGA's admissions plan is obviously patterned on the Harvard Plan countenanced by Justice Powell in *Bakke. See* doc. # 38 ¶ 24 (explaining that the TSI considers academic factors, such as honors courses and SAT score; demographic factors, such as Georgia residency, race, and gender; and leadership/activity factors, such as first generation college attendance, extracurricular activities, and work history).

Not surprisingly, then, UGA argues that "Justice Powell's opinion forms the basis for the majority decision [in *Bakke*] and should be considered the Court's holding." Doc. # 122 at 28. Under *Marks v. U.S.*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Id.* at 193, 97 S.Ct. 990 (cite omitted).

UGA's *Marks* argument avails it little. In *Bakke*, five Justices agreed that UCD's dual-track admissions system was invalid; the narrowest ground for this decision was the Stevens group's statutory, Title VI reasoning, rather than Powell's constitu-

tional holding. *Cf. Bakke*, 438 U.S. at 411, 98 S.Ct. 2733 (Stevens opinion) ("Our settled practice, however, is to avoid the decision of a constitutional issue if a case can be fairly decided on a statutory ground").

Furthermore, Powell's view as to the validity of a "Harvard-style" admissions system was mere dicta and not a holding in any event, since *Bakke* concerned a dual-track program rather than a "plus factor" program like Harvard's or UGA's. And significantly, Powell's statements regarding the use of a Harvard Plan admissions scheme for non-remedial purposes gained the support of no other Justice, much less a majority. *See id.* at 326 n. 1, 98 S.Ct. 2733 (Brennan group opinion) ("We also agree with Mr. Justice Powell that a plan like the 'Harvard' plan is constitutional under our approach, at least so long as the use of race to achieve an integrated student body is necessitated by the *lingering effects of past discrimination*")[5] (cite omitted; emphasis added); *see also Hopwood v. Texas*, 78 F.3d 932, 942 (5th Cir.1996) ("Powell's argument ... garnered only his own vote and has never represented the view of a majority of the Court in *Bakke* or any other case").

Thus, Justice Powell's opinion regarding the compelling nature of student body diversity in university admissions[6] is not binding precedent, although of course it carries some persuasive weight. Conse-

quently, this Court's task is not merely to apply the view of a lone Justice, but to glean from *Bakke* and other cases the status of the law regarding the non-remedial use of diversity to justify race-based preferences in university admissions.[7]

### 2. *Post-*Bakke *Cases*

Post-*Bakke*, the Supreme Court has continued to struggle to achieve consensus on so-called "benign" racial classifications. For example, in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), it held that a school board violated the Equal Protection Clause by extending preferential protection against layoffs to some teachers because of their race. *Id.* at 284, 106 S.Ct. 1842. But again the Court's reasoning was splintered. Four Justices applied strict scrutiny and held that, even if the board's asserted prior discrimination purpose was compelling, its action was not narrowly tailored to that purpose's fulfillment. *Id.* at 274, 277–84, 106 S.Ct. 1842. Justice White concurred in the judgment because he felt that the board's policy had the effect of "maintain[ing] a certain proportion of minority teachers." *Id.* at 294, 106 S.Ct. 1842.

A majority began to emerge in *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 485–86, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), wherein the Court invalidated Richmond, Virginia's minority set-aside pro-

---

**5.** UGA makes no such claim in this case.

**6.** On the one hand, Powell's *Bakke* opinion can be read to deem student body diversity a compelling governmental interest for purposes of strict scrutiny analysis. On the other, it cannot because the Justice variously referred to this interest as "constitutionally permissible," 438 U.S. at 311–12, 98 S.Ct. 2733, "substantial," *id.* at 313, 98 S.Ct. 2733, and "compelling," *id.* at 314, 98 S.Ct. 2733, and never stabilized on one standard in particular.

**7.** In arguing that its diversity interest is compelling, UGA attempts to distinguish the *Bakke* and *Hopwood* decisions by pointing out that it applies its racial preference only to a limited number of academically qualified applicants, and only as one relatively low-weighted factor among many, whereas the

programs invalidated in the former two cases were dual-track programs that applied completely different standards to white and minority applicants. Doc. # 122 at 38. But UGA cannot escape the fact that its admissions scheme favored some candidates over others (including these plaintiffs) solely because of their race. "For purposes of constitutional adjudication, there is no difference between the [plus factor and dual track] approaches." *Bakke*, 438 U.S. at 378, 98 S.Ct. 2733 (Brennan group opinion).

Thus, the *manner* in which the plan considers race goes only to the issue of whether it is narrowly tailored. The threshold issue is whether UGA can proffer an interest sufficiently compelling to justify using *any* kind of racial preference.

gram for awarding city contracts. Five Justices (in two separate opinions) concluded that strict scrutiny applied to all racial classifications. *See id.* at 493–94, 520, 109 S.Ct. 706. A majority also held that the facts did not support Richmond's asserted interests, and that its program was not narrowly tailored. *Id.* at 498–508, 109 S.Ct. 706.

In *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 552, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), a different five-Justice majority united in a single opinion to uphold a series of FCC minority preference policies. Noting that the policies were Congressionally mandated, the Court declared intermediate scrutiny the appropriate test. *Id.* at 563–66, 110 S.Ct. 2997. It also decided that the policies were substantially related to the important government interest of "enhancing broadcast diversity." *Id.* at 567–69, 110 S.Ct. 2997.

This holding was short-lived, however, for five years later a new majority overruled *Metro Broadcasting* in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 239, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The Court held that *"Metro Broadcasting* was ... a significant departure from much of what had come before it," and announced that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Id.* at 227, 115 S.Ct. 2097. The Court has maintained this view in subsequent cases. *See, e.g., Miller v. Johnson,* 515 U.S. 900, 904, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

### 3. UGA's Plan

Despite the Supreme Court's increasing hostility to even "benign" racial classifications, UGA argues that that Court continues to support Justice Powell's *Bakke* opinion. Doc. # 122 at 30–32. For example, Justice O'Connor's *Wygant* concurrence stated that "although its precise contours are uncertain, a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support

the use of racial considerations in furthering that interest." *Wygant,* 476 U.S. at 286, 106 S.Ct. 1842 (O'Connor, J., concurring) (citing Powell's *Bakke* opinion).

Moreover, Justice Stevens cited the Powell opinion approvingly in his *Croson* concurrence, *see Croson,* 488 U.S. at 512 n. 1, 109 S.Ct. 706 (Stevens, J., concurring), and extolled the virtues of faculty diversity in his *Wygant* dissent. *Wygant,* 476 U.S. at 315, 106 S.Ct. 1842 (Stevens, J., dissenting) ("In the context of public education, it is quite obvious that a school board may reasonably conclude that an integrated faculty will be able to provide benefits to the student body that could not be provided by an all-white, or nearly all-white, faculty") (footnote omitted). Furthermore, a Court majority in *Metro Broadcasting* held that broadcast diversity was an important interest. 497 U.S. at 567–68, 110 S.Ct. 2997 ("Just as a diverse student body contributing to a robust exchange of ideas is a constitutionally permissible goal on which a race-conscious university admissions program may be predicated, the diversity of views and information on the airwaves serves important First Amendment values") (quotes and cites omitted).

But significantly, not even in the now-overruled *Metro Broadcasting* did a majority of the Court hold that diversity was a compelling interest. Indeed, the Court there explicitly held only that it was "important." *Id.* As the Supreme Court has since made clear, the issue before this Court is not whether diversity is *important,* but whether it is *compelling. See Adarand,* 515 U.S. at 227, 115 S.Ct. 2097.

In that regard, UGA attaches too much weight to the dicta of Justice O'Connor's *Wygant* opinion, for she specifically noted—in that same opinion—that "diversity" as an interest supporting race-conscious State action was *not* at issue in the case. *Wygant,* 476 U.S. at 288, n. *, 106 S.Ct. 1842 (O'Connor, J., concurring). And, in her *Metro Broadcasting* dissent, she castigated the majority for upholding measures furthering an interest (broadcast diversity)

that was "insubstantial," "clearly not ... compelling," and "unrelated to any legitimate basis for employing racial classifications." 497 U.S. at 612, 110 S.Ct. 2997 (O'Connor, J., dissenting). Indeed, with the support of three other Justices, she stated: "Modern equal protection doctrine has recognized only one [compelling] interest: remedying the effects of racial discrimination," *id.*, an interest UGA does not advance here.

Therefore, despite the Supreme Court's often splintered reasoning in cases concerning "benign" racial classifications, a few points of clarity emerge: First, the Court looks askance at all explicit racial classifications, particularly those serving non-remedial interests. *See Adarand,* 515 U.S. at 227, 115 S.Ct. 2097. Second, mere racial balancing (i.e., proportional racial representation for its own sake) is clearly unconstitutional. *See Metro Broadcasting,* 497 U.S. at 614, 110 S.Ct. 2997 (O'Connor, J., dissenting) (citing *Croson,* 488 U.S. at 507, 109 S.Ct. 706).

Third, in order to justify race-conscious measures, such an interest must be deemed "compelling." *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097. And fourth, a majority of the Court has never formally announced whether diversity, particularly student diversity in higher education, does or does not reach that "compelling" level.

Conversely, a majority has agreed that an "ill-defined" or "amorphous" interest is insufficiently compelling. *Croson,* 488 U.S. at 498–99, 109 S.Ct. 706. Both recent history and the record in this case show that an interest in "diversity" is amorphous at best. Indeed, the very concept of "diversity" has "become so malleable that it can instantly be conscripted to march in any ideologue's army, and exploited by government officials to avoid answering tough questions." *Tracy,* 59 F.Supp.2d at 1321–22 (cites omitted). It has "been coined both as a permanent justification for policies seeking racial proportionality in all walks of life ('affirmative action' has only a temporary remedial connotation) and as a synonym for proportional repre-

sentation itself." *Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 356 (D.C.Cir.1998) (describing "how much burden the term 'diversity' has been asked to bear in the latter part of the 20th century in the United States").

Further evidence that the term has long since been loosed from its denotative moorings comes from UGA itself. The record shows that UGA is plying a "diversity = proportionalism" rationale. *See* doc. # 130 exh. A at 1 (UGA President Michael Adams's speech reaffirming use of racial preference, in which he states, "I remain committed to diversity ... and particularly to increasing the representation of African–Americans within the University of Georgia student body"); *id.* at 3 ("[UGA] wants to be fair, it wants to be accessible, it wants to be *representative of the total population of the state*") (emphasis added).

In its brief responding to the plaintiffs' summary judgment motion, UGA claims that "[t]he fact that UGA's administration wants to insure that all citizens of Georgia have *equal access to and representation in* that institution is not unconstitutional but legally and morally justifiable." Doc. # 149 at 8 (emphasis added). The problem, of course, is that in UGA's world some are "more equal" than others. UGA's claim that it can simultaneously ensure equality of both opportunity and result, particularly by means of an admissions process that awards bonus points to some races but not others, simply defies logic.

UGA's inability "to meaningfully show how [racial diversity] actually fosters educational benefits," *see Tracy,* 59 F.Supp.2d at 1322, further bespeaks the inherently amorphous nature of this concept. Former UGA President Charles Knapp insists that, after graduation, students will need to work cooperatively with people from "different ethnic and cultural backgrounds," and this skill "cannot be fully acquired by students whose educational and life experiences have been racially or

culturally homogenous." Doc. # 124 (Knapp aff.) ¶ 12.

In support of that rationale, Knapp "relie[s] upon [his] experience as an instructor ... and ... administrator in concluding that college-age students benefit educationally and economically from interaction with peers drawn from diverse backgrounds and experiences." *Id.* ¶ 13. A diverse student body also "fosters an awareness of commonalities," and "enables students to make friends, forge relationships, and develop group identities on bases other than shared ethnic, geographic, or socioeconomic background." *Id.* ¶ 15.

Knapp further claims that, "[b]ased on my experience teaching undergraduate economics classes and my conversations and interactions with members of UGA's teaching faculty, it is apparent that student heterogeneity—including but not limited to racial diversity—contributes to education that also occurs inside the classroom." *Id.* ¶ 19.

Thus, Knapp justifies UGA's racial preference with syllogism and speculation. He relies upon the truism that relationships between people of different backgrounds are based on something other than a shared background. His reasoning also rests on the inherently speculative assumption that people from racially homogenous environments cannot "fully work cooperatively" with individuals of a different race when they finally encounter them. Heterogeneity, he further contends, somehow contributes to better classroom learning.

Knapp supports his speculations with data no more quantifiable than his years of teaching/administrative experience. But this sort of circular, "it is because I say so" logic is precisely what the Supreme Court resoundingly rejected in *Croson.* *See* 488 U.S. at 500, 109 S.Ct. 706 ("when a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals"); *id.* at 501, 109 S.Ct. 706 ("The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis").

For that matter, an amorphous governmental interest like UGA's by definition contains no principled stopping point. The Supreme Court forbids this. In *Croson,* for example, the majority held that Richmond had failed to demonstrate a compelling interest supporting its set-aside program. Were Richmond correct in its "claim that [an interest in combating] past societal discrimination alone" is compelling, it "would open the door to competing claims [from different groups and create] a mosaic of shifting preferences based on *inherently unmeasurable claims* of past wrongs." *Id.* at 505–06, 109 S.Ct. 706 (emphasis added). Consequently, "[t]hose whose societal injury is thought to exceed some *arbitrary level of tolerability* then would be entitled to preferential classifications." *Id.* at 506, 109 S.Ct. 706 (emphasis added).

For the same reason, the *Wygant* plurality rejected the school board's avowed interest "in providing role models for its minority students." 476 U.S. at 274–75, 106 S.Ct. 1842 ("the role model theory employed by the District Court has no logical stopping point"). Moreover, "[i]n the absence of particularized findings," which UGA here lacks, "a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future." *Id.* at 276, 106 S.Ct. 1842.

For this reason, an "interest capable of justifying race-conscious measures must be sufficiently specific and verifiable, such that it supports only limited and carefully defined uses of racial classifications." *Metro Broadcasting,* 497 U.S. at 613, 110 S.Ct. 2997 (O'Connor, J., dissenting). "Student body diversity" simply does not meet this high standard. UGA uses the goal of diversity to justify its admissions program, but cannot or does not ever identify with particularity exactly when or how that goal will ever be met. *See* doc. # 137

(McDuff dep.) at 20 ("I've never been given a numeric or a percentage target. I've often felt that growth [in number of minorities] is good and that reduction is bad"); *id.* at 148 ("when [will the minority preference] terminate? ... A. *I don't know if it would end tomorrow or a hundred years from tomorrow*") (emphasis added).

To base racial preferences upon an amorphous, unquantifiable, and temporally unlimited goal is to engage in naked racial balancing—something even Justice Powell deemed constitutionally impermissible in *Bakke,* 438 U.S. at 307, 98 S.Ct. 2733 (Powell opinion) ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids"). This conclusion is echoed in Justice O'Connor's warning that a claim of insufficient diversity

> might be used to justify equally unconstrained racial preferences, linked to nothing other than proportional representation of various races. And the interest would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that [this mixture] continues.... We cannot deem to be constitutionally adequate an interest that would support measures that amount to the core constitutional violation of outright racial balancing.

*Metro Broadcasting,* 497 U.S. at 614, 110 S.Ct. 2997 (O'Connor, J., dissenting). Here the record shows that UGA's racial preference has just such a proportionalism goal. *See, e.g.,* McDuff dep. at 65 ("the diversity [the TSI is] designed to achieve is just the admission of non-Caucasians? A. Yes"); doc. # 140 (Adams dep.) at 81 ("You feel that 10% [of admitted students are minorities] is not enough?.... What is the basis for that? A. *Well, we know what the makeup of the state is* and I guess I'm surprised that those numbers

have been as steady ....") (emphasis added).

In short, this Court simply cannot "accept as adequate for equal protection purposes an interest unrelated to race, yet capable of supporting measures so difficult to distinguish from proscribed discrimination," *Metro Broadcasting,* 497 U.S. at 615, 110 S.Ct. 2997 (O'Connor, J., dissenting), particularly when such an interest is so ill-defined. UGA's admissions process gives preferential treatment to racial minorities merely because of their status as racial minorities. UGA does so in the belief that this will foster some amorphous, intangible, yet allegedly real educational benefit. But under such a diversity interest, it "will prove impossible to distinguish naked preferences for members of particular races from preferences for members of particular races because they possess certain valued views." *Id.* at 615–16, 110 S.Ct. 2997.

UGA's diversity rationale also treads upon constitutional prohibitions by relying on stereotypical beliefs about the contributions of members of particular races. As a Supreme Court majority has stated: "[Courts] may not accept as a defense to racial discrimination the very stereotype the law condemns." *Miller v. Johnson,* 515 U.S. 900, 920, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (quoting *Powers v. Ohio,* 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

A "Harvard-style" admissions program is based on the assumption that an "atmosphere of speculation, experiment, and creation ... is ... promoted by a diverse student body." *Bakke,* 438 U.S. at 312, 98 S.Ct. 2733 (Powell opinion) (quotes omitted). In awarding bonus points for minority applicants, UGA's process presupposes that, merely by their minority status, such applicants will contribute to a "diverse atmosphere."[8] How? UGA merely presumes, stereotypically, that all members of

---

8. The other possibility is that UGA does not equate racial diversity with beneficial ideological diversity, but rather seeks racial diversity for its own sake. This, of course, is clearly unconstitutional. *Bakke,* 438 U.S. at 307, 98 S.Ct. 2733 (Powell opinion); *Metro Broadcasting,* 497 U.S. at 614, 110 S.Ct. 2997 (O'Connor, J., dissenting).

a particular minority race will think, act, etc., differently from whites and thus "contribute" to the student body's "overall educational experience."

However, this procrustean presumption is prohibited. A State simply "may not allocate benefits and burdens among individuals based on the assumption that race or ethnicity determines how they act or think." *Metro Broadcasting*, 497 U.S. at 602, 110 S.Ct. 2997 (O'Connor, J., dissenting). *See also id.* at 621, 110 S.Ct. 2997 ("The FCC has used race as a proxy for whatever views it believes to be underrepresented in the broadcasting spectrum. This reflexive or unthinking use of a suspect classification is the hallmark of an unconstitutional policy").

Like the program struck down in *Croson*, UGA's system uses race as a proxy for the asserted interest: here, minorities are presumed, through their presence, to make a valued contribution to the other students' education, whereas in *Croson*, minorities were assumed to have suffered from past discrimination. *See Croson*, 488 U.S. at 508, 109 S.Ct. 706 ("the Richmond . . . system focuses solely on the availability of MBE's [minority businesses]; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors").

As the plaintiffs point out in their brief, "[i]dentifying a young adult by his or her race is the antithesis of treating that person as an individual[,] since 'race identifies groups.'" Doc. # 151 at 12 (citing *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 864 (9th Cir.1998)) (brackets added and omitted). But, as Justice Powell reiterated in *Bakke*, Fourteenth Amendment rights are personal rights, not group rights, and are "guaranteed to the individual." 438 U.S. at 289, 98 S.Ct. 2733 (Powell opinion). A policy relying on the crude, and dangerous, proxy of race for ideological diversity sits in antipathy to this principle.

"The moral imperative of racial neutrality is the driving force of the Equal Protection Clause." *Croson*, 488 U.S. at 518, 109 S.Ct. 706 (Kennedy, J., concurring). To declare the amorphous, stereotype-driven interest of diversity in higher education to be sufficiently compelling to justify race-based classifications would be a step away from "that ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race." *Wygant*, 476 U.S. at 320, 106 S.Ct. 1842 (Stevens, J., dissenting). Such a step, moreover, would violate binding Supreme Court precedent.

UGA places much stock in the fact that other courts have declined to hold that diversity is not a compelling interest. *See* doc. # 122 at 35–36 (citing *Eisenberg v. Montgomery County Pub. Schs.*, 197 F.3d 123, 130 (4th Cir.1999); *Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 705 (4th Cir.1999); *Wessmann v. Gittens*, 160 F.3d 790, 796 (1st Cir.1998)). However, those courts all assumed, without deciding, that the diversity interest was compelling, then held that the respective programs were not narrowly tailored to meet it. *See Eisenberg*, 197 F.3d at 130–33; *Tuttle*, 195 F.3d at 705–07; *Wessmann*, 160 F.3d at 796–800.

Jurisprudential doctrine encourages courts to decide constitutional questions[9] on the narrowest possible grounds. Here, however, the Court has determined that the "diversity" interest is so inherently formless and malleable that *no* plan can be narrowly tailored to fit it. Hence, the Court has no business traveling on assumptions, but rather must face the threshold interest issue head-on. In that respect, legal history demonstrates that the "assumption" dodge invoked by other

---

9. As stated previously, this Court nominally is presented only with the issue whether UGA's admissions program violates Titles VI and IX. But since the statutory and equal protection analyses are identical, *see* supra at 1366, the Court effectively is reaching the constitutional (equal protection) question.

courts has, in the affirmative action realm, encouraged nothing but endless rounds of costly and divisive litigation. That cycle stops here.

Therefore, the Court holds that the promotion of student body diversity in higher education is not a compelling interest sufficient to overcome Title VI's prohibition against racial discrimination. Accordingly, UGA's race-conscious 1999 admissions scheme violated Title VI.

### C. Validity of UGA's Gender Preference

■ UGA uses the same diversity rhetoric to justify its gender preference. In so doing, it demonstrates that interest's utter lack of any limiting principle, and the attendant danger of a diversity rationale run amok. The record reveals that UGA's gender bonus points, despite being cloaked in the language of "diversity-fostering," represent nothing more than inartfully veiled gender balancing.

Perhaps the best proof of that flows directly from UGA's admissions director. Questioned about the gender preference itself, she answered that it was added to increase the proportion of males in the entering class:

Q. Okay. Now, what are the factors that went into determining that males should be advantaged by 0.25 points in the total student index?

A. I don't remember any specific analysis that went into the number, if that's what you're asking. We were aware of the fact when we were looking at a series of factors to put in the TSI that there were various needs of the institution.

Q. Needs for more males?

A. Needs for more males.

Q. And what is the academic reason that the University would need more males?

A. Again, it's crafting a class, the concept that the entire freshman class is a group and disproportionately the group was becoming more female.

Q. Why is that?

A. It's a national phenomenon that women are finishing high school [in] larger percentages than they exist in the population, they are college bound at a higher percentage than they exist in the population, and they're finishing college at a faster rate at a higher percentage, so it's a national issue for most co-ed institutions that the male-female ratios are out of balance.

The state of Georgia is 49th in the country in the percentage of baccalaureate degrees going to males. It's a major problem in this state.

Q. Why is that a problem?

A. Because our men are not completing college degrees at the same rate as our females are.

McDuff dep. at 33–34. Director McDuff then provided an even more explicit link between UGA's diversity rationale and gender proportionalism:

Q. And this policy is because—or at least the hope is that this policy will produce a crafted class that is more proportionate in terms of male and female representation?

A. Yes.

Q. And what is the academic reason or purpose for that on campus? What does a more proportionate gender-based class do for each other academically?

A. I assume that the faculty could answer that better than I could since I'm not a faculty member.

Q. Do you know?

A. My understanding is that diversity is valued on this campus in any number of forms and gender diversity is valued.

*Id.* at 38.

■ UGA's asserted need for "gender diversity," then, obviously is a front for its gender-balancing desire. And since UGA's diversity rationale (which, as its gender preference policy clearly demonstrates, can easily be used to rationalize proportionalism, even to the detriment of historically *dis*favored groups) is not compelling in the race preference context, nei-

ther is it compelling here. UGA's Fall 1999 admissions plan therefore violated Title IX.[10]

### D. Plaintiffs' Entitlement to Relief

■ Because the plaintiffs were rejected during the race- and gender-conscious phase of UGA's admissions process, but would not have been rejected had they been awarded the race and gender bonus points, *see* doc. # 38 ¶¶ 34, 38, 42–43, they have shown that they were harmed by the admissions scheme's statutory violations. *See Adarand,* 515 U.S. at 211, 115 S.Ct. 2097 ("The injury in cases of this kind is that a discriminatory classification prevent[s] the plaintiff from competing on an equal footing") (quotes and cite omitted; alteration in original).

But it doesn't necessarily follow that the plaintiffs are entitled to recover. "Under *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration." *Texas v. Lesage,* —— U.S. ——, 120 S.Ct. 467, 468, 145 L.Ed.2d 347 (1999).

Thus, UGA has the burden of demonstrating that it would have made the same decision to reject the plaintiffs even if race and gender had not been used. *See Hopwood,* 78 F.3d at 957 ("[i]n the event that the ... school is unable to show (by a preponderance of the evidence) that a respective plaintiff would not have been admitted ... under a constitutional admissions system, the court is to award to that plaintiff any equitable and/or monetary relief it deems appropriate").[11]

The intervenors attempt to make this showing by proffering a statistical analysis of UGA's 1999 applicants. *See* doc. # 134 at 13–15; # 116. Their expert, Dr. Shapiro, analyzed the plaintiffs'[12] AI and curriculum difficulty (CD)[13] scores, and compared them with those of other applicants. Doc. # 116. Finding that CD "is a strong correlate of admission," *id.* at 4–5, Shapiro opines that "Beckenhauer's relatively low AI coupled with her very low Curriculum Difficulty appear to completely explain her failure to be admitted," and that "the data [of applicants with Bogrow's CD and with her AI or below] completely support the conclusion that Ms. Bogrow's failure to be admitted was unrelated to her being White." *Id.* at 12–13.

But Shapiro's analysis is fatally flawed. As he notes, CD "is not incorporated into the AI." *Id.* at 2.[14] And it is only partially used in the TSI. *Compare* doc. # 162 exh.

---

**10.** Such gender preferencing would not even survive the less rigorous intermediate scrutiny employed in sex-based equal protection claims. Under *U.S. v. Virginia,* "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (cite omitted). The desire to "help out" men who are not earning baccalaureate degrees in the same numbers as women, *see* McDuff dep. at 34; Knapp aff. ¶ 26, is far from persuasive.

**11.** The intervenors' argument that plaintiffs have not met their burden of proving intentional discrimination, *see* doc. # 134 at 11–14, is meritless. As discussed above, the plaintiffs alleged and proved a sufficient injury to invoke the *Mt. Healthy* burden-shift. *See also Hopwood,* 78 F.3d at 957 (holding that, although the challenged race-conscious admis-

sions scheme was created in good faith, "there is no question that [the defendants] intended to treat the plaintiffs differently on account of their race").

**12.** Actually, he analyzed only the scores of Bogrow and Beckenhauer, because the intervenors maintain that UGA's belated offer of admission to Johnson moots her claims. Doc. # 134 at 10–11. The Court has already considered and rejected this claim, however. *See* doc. # 55 at 12.

**13.** The CD score measures the difficulty of the applicant's high school curriculum, and ranges from 1 (most difficult), to 5 (least difficult). Doc. # 116 at 2.

**14.** However, for applicants with CD ratings of "most difficult," UGA lowers the minimum AI value required for automatic admission at the AI stage to 2.81. *Id.*

A (showing that the TSI gives .50 bonus points only if the CD is rated a "1"), *with* doc. # 116 (analyzing the admission rates for those with all CD scores, from 1 through 5). Essentially, then, he is taking only two of the several race-neutral factors that were considered in UGA's admissions scheme, and that *correlate* with its overall results, and claiming (based on the correlation) that these factors would have *caused* the same result. Correlation, though, does not equal causation.[15]

Furthermore, Shapiro's analysis skirts, rather than addresses, *Mt. Healthy*'s requirement. Again, UGA must prove that "it *would have* made the same decision absent the forbidden consideration," *Lesage*, 120 S.Ct. at 468 (emphasis added), not that it *could have* made the same decision. So the question is not whether the plaintiffs would have been denied admission under *a* constitutional admissions process, but whether UGA would have denied them admission under *the actual plan used*, minus (only) the prohibited race and gender factors. *See Bakke*, 438 U.S. at 321 n. 54, 98 S.Ct. 2733 (Powell opinion) ("Having injured respondent solely on the basis of an unlawful classification, petitioner cannot now hypothesize that it might have employed lawful means of achieving the same result").

The evidentiary showing *Mt. Healthy* requires, incidentally, is not difficult to understand. UGA could have made a same-decision showing by demonstrating, for example, that: (a) 1000 applicants were denied admission at the TSI stage; and (b) after re-ranking all the TSI-stage applicants (applying all but the race and gender TSI factors), the plaintiffs ranked among the bottom 1000 applicants. But it has not done this, so the Court must now consider the propriety of the plaintiffs' specific claims for relief.

### 1. Increased Expenses

■ After UGA denied them admission, the plaintiffs each attended other institutions. They now seek damages to compensate them for the increased expense of doing so. Doc. # 130 at 22. They divide these expenses into four categories: tuition, housing, meals, and books. *Id.*

UGA contends that plaintiff Johnson was admitted to UGA and therefore is not entitled to any damages. Doc. # 122 at 47–48. Johnson concedes that UGA offered her admission in August 1999. Doc. # 143 (Johnson dep.) at 27–28. However, UGA had previously denied her application for admission, and her subsequent appeal of that decision. *See id.* exh. 4. She then made plans to attend Mercer University. *Id.* at 27. UGA offered her admission on 8/13/99, in an effort to moot her lawsuit, *see* doc. # 55 at 12 n. 11, only a single day before Mercer's orientation began, and the day before Johnson was to move there. Johnson dep. at 27 & exh. 6.

While Johnson undoubtedly has a duty to mitigate her damages (i.e., by enrolling at UGA upon acceptance there rather than attending Mercer and suing for the difference), that duty entails only reasonable mitigation efforts. *Cf. EEOC v. Joe's Stone Crab, Inc.*, 15 F.Supp.2d 1364, 1379 (S.D.Fla.1998) (Title VII claimant's duty to mitigate requires "only an honest, good faith effort") (quotes and cite omitted). Johnson had made plans to attend Mercer in reliance upon UGA's denials of her application and appeal. To require Johnson to dash those plans three months later, on the eve of moving to Mercer, is more than reasonable effort demands. UGA's belated switch less than 24 hours before her planned move did not provide her with adequate time to arrange a place to live, find a roommate, and break her arrangement with her roommate at Mercer. Johnson dep. at 30. UGA, not Johnson, should bear the risk that UGA's offer of enrollment came too late to provide her with a reasonable choice.

■ However, Johnson admitted in her deposition that UGA's offer of admission to her remained open and that she could

---

**15.** If it did, then a study showing that 75% of bald men wear hats outdoors could be used to prove that wearing a hat outside causes baldness.

attend UGA at any time. *Id.* at 33. Although she did not have enough time to decide whether to accept UGA's offer before the Fall 1999 semester began, she had several months to ponder the issue before the Spring 2000 semester. But she chose to remain at Mercer rather than transfer to UGA. *Id.* at 34. Therefore, she can recover for her Fall, but not Spring, semester expenses.

UGA next argues that none of the plaintiffs should be allowed to recover their expenses, because their parents, rather than they, paid those expenses. Doc. #122 at 48–49 (citing *Wolkenhauer v. Smith,* 822 F.2d 711 (7th Cir.1987); *Springer v. Fairfax County Sch. Bd.,* 134 F.3d 659 (4th Cir.1998); *Hopwood v. Texas,* 999 F.Supp. 872 (W.D.Tex.1998) (*Hopwood II*)). Two of these cases are clearly inapposite. In *Springer,* the plaintiff's parents joined him in bringing a 20 U.S.C. § 1400 suit because the plaintiff was a minor. 134 F.3d at 659. Here, no plaintiff is a minor. *See* Johnson dep. at 5; doc. #144 (Bogrow dep.) at 6; doc. #145 (Beckenhauer dep.) at 6.

And in *Hopwood II,* the court did grant the plaintiffs only $1 each in damages, despite finding that one plaintiff incurred a tuition differential of $40,036. 999 F.Supp. at 909, 923. The award, however, sounded only in nominal damages because the court found that the plaintiffs would not have been admitted even if a race-neutral process were employed. *Id.* at 893. Thus, its tuition differential finding was an "alternative finding[ ] of fact ... to ensure there is no third trial and for the benefit of the circuit court." *Id.* at 901. The implication, then, is that if the appellate court were to reverse the district court on its same-decision conclusion, the tuition differential would be awarded, since the court explicitly made and reported that factual finding. Therefore, *Hopwood II* is also distinguishable.

That leaves UGA with *Wolkenhauer,* an Illinois diversity case. There the court affirmed the denial of costs incurred in retraining a plaintiff injured by an automobile collision, because the plaintiff expressed doubt about continuing the retraining program, the subject matter of the retraining was unrelated to his former job, and he could still perform his former job. 822 F.2d at 716. But the court stated in a footnote that an additional reason to deny this expense was that a rehabilitation program paid the plaintiff's tuition under the Job Training Partnership Act. *Id.* at n. 3.

■ *Wolkenhauer,* then, is distinguishable as well, but it also beckons the Court to acknowledge the collateral source doctrine. Under that rule, "the receipt of benefits or mitigation of loss from sources other than the defendant will not operate to diminish the plaintiff's recovery of damages." *MacDonald v. U.S.,* 900 F.Supp. 483, 486 (M.D.Ga.1995) (quotes and cite omitted). Thus, "funds unrelated to the conduct at issue and received from third parties are not counted as mitigating earnings." *Joe's Stone Crab,* 15 F.Supp.2d at 1375 n. 22 (citing *NLRB v. Gullett Gin Co.,* 340 U.S. 361, 364, 71 S.Ct. 337, 95 L.Ed. 337 (1951)).

"Although this rule sometimes results in a windfall for the injured party, the rationale supporting the rule is that if there is to be a windfall, it is more just that it go to the injured party rather than the tortfeasor." *Westchester Specialty Ins. Servs., Inc. v. U.S. Fire Ins. Co.,* 119 F.3d 1505, 1512 n. 13 (11th Cir.1997) (cite omitted); *but see id.* (noting that the collateral benefits must be "wholly independent" of the activity between the plaintiff and defendant). Although the collateral source rule is most often applied by federal courts only in diversity tort cases, the *Joe's Stone Crab* court utilized it in the gender discrimination context. *See* 15 F.Supp.2d at 1375.

Here the funds to pay for the plaintiffs' college expenses certainly did not come from UGA, and therefore are collateral. Furthermore, UGA does not allege that the plaintiffs' parents' payments were not independent of UGA's action (e.g., that their parents had agreed to pay only those

expenses incurred if they were denied admission to UGA). Therefore, the just result would be to give the plaintiffs, rather than UGA, the benefit of their parents' largesse.

Accordingly, Johnson is entitled to recover the expenses that she paid at Mercer for the Fall 1999 semester, to the extent they exceed what she would have paid to attend UGA. Similarly, Aimee Bogrow and Molly Ann Beckenhauer can recover the amount that their actual college expenses for the 1999–2000 academic year exceeded what they would have been at UGA.

To that end, the parties appear to agree that the official estimated expense of attending UGA during the 1999–2000 year is $10,370. *See* doc. # 130 exh. G at 2; doc. # 125 ¶ 5.[16] They also seem to agree that Johnson would have qualified for the HOPE scholarship at UGA. *See* doc. # 130 exh. H ¶¶ 5, 10 (she actually received a HOPE grant at Mercer); # 149 at 13. Johnson's Mercer expenses for the year were $11,156.35. Doc. # 130 exh. H ¶ 9. Less the $3,334 in HOPE funds, *see id.* ¶ 8, she would have paid $7,036 at UGA for the year. The difference, then, is $4,120.35. Divided in half to reflect only Fall semester expenses, Johnson is entitled to $2,060.18.

■ Bogrow attended Georgia Perimeter College beginning in the Spring 2000

semester. *Id.* exh. J ¶ 2. Her expenses totaled $1,123.55. *Id.* ¶ 4. Dividing the estimated UGA yearly expenses by 2 to reflect the single semester yields a value of $5,185.00.[17] Whether or not she is entitled to reduce her UGA expenses by the value of the HOPE scholarship (which the parties dispute, *see id.* ¶ 6; doc. # 149 at 13 n. 5), she obviously has saved, rather than expended, money by going to Georgia Perimeter rather than UGA. Thus, she is entitled to no compensatory damages but only a nominal amount (i.e., $1). *See Wooden v. Bd. of Regents*, 32 F.Supp.2d 1370, 1378 (S.D.Ga.1999) (Title VI permits an award of nominal damages); *Hopwood II*, 999 F.Supp. at 923 (awarding nominal damages for a Title VI violation).

■ Beckenhauer attended Clemson University after UGA rejected her. Doc. # 130 exh. I ¶ 2. The Court must deny her claim for her Summer 1999 semester expenses, *see id.* ¶ 4, because the record does not show that she applied to UGA for that semester. In proving the differential between her Clemson and UGA expenses, she contends her estimated UGA expenses would be lower than what UGA claims, because of the HOPE scholarship. *Id.* ¶ 8.

UGA disputes this because Beckenhauer voluntarily chose a non-HOPE-assisted institution. Doc. # 149 at 13 n. 6.[18] The

---

**16.** While the plaintiffs do dispute whether this estimated figure should be used, *see* doc. # 157 at 4–5 (arguing that the proper figure is the sum of the costs of tuition, housing, meals, and books), the Court finds this figure to be the most appropriate. The plaintiffs have been harmed to the extent their total actual college expenses exceed the total expenses they would have incurred at UGA. Therefore, the proper measure of recovery is their documented actual expenses, less the estimated amount of total expenses at UGA.

**17.** Bogrow claims no housing or meal expenses, *see id.*, presumably because she lived at home while attending school. She then attempts to recover the difference between only her tuition and book costs and those corresponding expenses at UGA. However, as the Court previously noted, Bogrow has "been harmed to the extent [her] *total actual*

*college expenses* exceed the *total expenses* [she] would have incurred at UGA." Supra n. 16 (emphasis added).

Bogrow undoubtedly incurred room and board expenses during her semester at Georgia Perimeter (even if she lived at home and incurred no out-of-pocket expenses, the portion of her family's expenditures attributable to her has a fair market value). And she certainly would have incurred these expenses had she attended UGA. Thus, she cannot choose to treat these expenses as if they do not exist. But since she has offered no proof of what her actual room and board expenses were, the Court will treat her actual college expenses as the total amount she has documented—i.e., her tuition and book costs.

**18.** UGA does not, however, dispute Beckenhauer's assertion that she would have re-

Court need not define the outer limits of plaintiff's mitigation duty here; it is enough to say that it should not outweigh her academic choice. Beckenhauer accrued $14,220.93 in expenses in the 1999–2000 year at Clemson. Subtracting from that the $7,036.00 that she would have spent to attend UGA (with a HOPE scholarship) yields damages of $7,184.93.

### 2. Emotional Distress

 The plaintiffs also seek damages for emotional distress stemming from their denial of admission to UGA. Doc. # 151 at 30–32. Each claims she suffered emotional trauma because of UGA's discrimination. *See* Johnson dep. at 20 (describing that she was "heartbroken ... I felt worthless ... like everything I had ever worked for ... had just been thrown away and that there was just no hope. ..."); Bogrow dep. at 40 (noting that her reaction was "shock and immense disappointment"); Beckenhauer dep. at 40–41 (explaining that she was embarrassed, angry, and had difficulty adjusting at Clemson because she didn't know anyone there).

However, each plaintiff admitted that she sought no counseling or psychiatric treatment relating to emotional distress, nor exhibited any other physical ailments resulting from it. Johnson dep. at 20–21; Bogrow dep. at 40–41; Beckenhauer dep. at 26–27. Indeed, Johnson and Beckenhauer admit that they are now happy at college. *See* Johnson dep. at 31; Beckenhauer dep. at 33.

While being rejected from UGA was undoubtedly painful and distressful, the plaintiffs have simply not asserted compensable emotional harm. *See Hodor v. GTE Mobilnet, Inc.*, 244 Ga.App. 297, —— S.E.2d ——, ——, 2000 WL 694736 at * 2 (2000) (elements); *Jarrard v. United Parcel Serv., Inc.*, 242 Ga.App. 58, 59, 529 S.E.2d 144 (2000). As in *Hopwood II*, "the

denial [of admission], at most, resulted in the mere hurt feelings, frustration, and anger that are simply a part of everyday life." 999 F.Supp. at 910.[19]

### 3. Injunction Ordering Admission

 The plaintiffs also seek an injunction ordering UGA to offer them admission. *See* doc. # 151 at 32–36. UGA opposes such relief, arguing that the plaintiffs have not affirmatively established that they would have been admitted but for the invalid race and gender considerations. Doc. # 122 at 50–52.

UGA's argument misstates the law. As made clear in *Hopwood*, 78 F.3d at 956–57, and *Lesage*, 120 S.Ct. at 468, once the plaintiffs establish that UGA's admissions program violated Title VI and Title IX by intentionally discriminating against them based on race and gender, the burden is *on the defendant* to show that the plaintiffs would not have been admitted notwithstanding its discriminatory conduct.

As discussed above, the plaintiffs have established that UGA's admissions scheme violated Title VI and Title IX. And UGA has not met its burden of proving that the plaintiffs would not have been admitted anyway. It admits it cannot recreate the admissions process to make such a showing. *See* doc. # 122 at 51 ("Since acceptances and rejections are unique in time, the entire TSI process cannot be recreated"); McDuff dep. at 53–54 ("If the student's TSI did not admit them or put them into the edge read file, I can't create that environment again").[20] Hence, injunctive relief is appropriate.

## IV. CONCLUSION

Accordingly, the motions for summary judgment by the defendant Board of Regents of the University System of Georgia, d/b/a the University of Georgia (UGA), and by defendant-intervenors Antoine Hester,

---

ceived the HOPE scholarship had she attended UGA.

**19.** Moreover, plaintiffs' claims that they incurred emotional distress from the litigation of this case, *see* doc. # 151 at 31, fail because this harm is not compensable either. *See*

*Hopwood II*, 999 F.Supp. at 907 (holding that damage claims relating "to the litigation [the plaintiff] initiated and the justifiable defense of this case ... are not recoverable").

**20.** And, as held previously, the intervenors have not met this burden either.

et al., (doc. # # 117, 121) are *DENIED*. The intervenors' Motion for Leave to File Reply (doc. # 163) is *GRANTED*. The motion of plaintiffs Jennifer L. Johnson, Aimee Bogrow, and Molly Ann Beckenhauer for summary judgment (doc. # 130) is *GRANTED IN PART AND DENIED IN PART*.

The Clerk shall enter judgment against UGA in favor of the plaintiffs in the following amounts: $2,060.18 to Jennifer Johnson; $1 to Aimee Bogrow, and $7,184.93 to Molly Ann Beckenhauer.

Finally, the Court directs UGA, together with its officers, agents, and employees, to offer Aimee Bogrow and Molly Ann Beckenhauer admission for the Fall 2000 semester, and to keep its admission offer to Jennifer L. Johnson open for the Fall 2000 semester.[21] This case is now *CLOSED*.

21. UGA has claimed no practical obstacle to this relief.